DAVID C. HINDS
BY GUARDIAN
*vs.*
JOHN HANCOCK MUTUAL LIFE INSURANCE CO.

Kennebec.    Opinion, October 27, 1959.

*Niehoff & Niehoff,*
*Lewis L. Levine,* for plaintiff.

*Locke, Campbell, Reid & Hebert,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, JJ. SIDDALL, J., did not sit.

WEBBER, J.   Plaintiff is beneficiary of an insurance policy covering the life of his late father, Donald Hinds.  The policy provides for payment of a death benefit of $9,000 and, in addition thereto, of a like sum in the event the death of the assured should be due to bodily injuries sustained solely through "violent, external and accidental means." Suit was brought in behalf of plaintiff, a minor, by Emily Hinds, his mother and legal guardian.  It is not disputed that the death of the assured being shown, the plaintiff is entitled to recover the ordinary death benefit of $9,000. The jury, however, awarded double indemnity as reflected by a verdict of $18,000.  Issues are raised both by general motion and exceptions.

At the outset it was stipulated that an analysis of the blood of the decedent, Donald Hinds, made shortly after his death, disclosed an alcoholic content of .267% by weight. During the presentation of the plaintiff's case, it was shown by competent medical and other testimony that the assured was found slumped unconscious in a chair at his kitchen table late in the evening; that he was removed to a hospital and died there without regaining consciousness; that the cause of death was a gunshot wound inflicted by a revolver fired while in contact with the skin in the region of the right temple; that the bullet pursued approximately a horizontal course through the head from right to left; that decedent was a "big man" over six feet tall and weighing about 200 pounds; that he was fifty years old and apparently in good health; that on a table at his right side were a revolver and an opened package of bullets; that there were present no cloths or other gun cleaning paraphernalia; that there were no outward or visible signs of any violent scuffle, quarrel or other disturbance on the premises; and that there were empty whiskey bottles near the decedent's body. The family physician, first to arrive at the scene, found Emily Hinds holding her husband's head. He described her as appearing confused and in a state of shock. Social and business friends gave testimony tending to negative any apparent motive for suicide. A medical expert stated that one in the decedent's state of intoxication would be confused, with his reactions markedly slow and his pain sensation diminished; that he would be unable to think clearly but would not be unconscious and would be able to "navigate" although not very steadily. Not one of the witnesses had ever before seen the decedent in this stage of intoxication. Emily Hinds, although inferentially an eye witness to the tragedy, was not called by the plaintiff.

On this posture of the evidence, as will be shown, the plaintiff at the close of his main case had by no means

offered sufficient proof of death by "accidental means." However, no request was made to the court to direct a verdict and we are satisfied that the election by counsel for the defendant to go forward with evidence stemmed largely from the uncertainty heretofore existing in this jurisdiction as to the evidentiary status of presumptions. We will have occasion to discuss this problem later in the opinion. Attention should first be given, however, to the evidence offered by the defendant.

The witness first called in defense was Emily Hinds. At the very beginning of her examination, she was asked if she was the widow of Donald Joseph Hinds. She then replied, "I refuse to *testify*, on the advice of counsel, on my constitutional right that it might tend to incriminate me." (Emphasis supplied.) She was then asked, "Do you consider that you would be incriminated by being the wife of Donald Joseph Hinds?" At this point the jury was ordered to retire and colloquy then ensued which resulted in a ruling by the presiding justice that the pending question and all further questions of this witness were *excluded* because of her claim of privilege. Defendant's counsel took no exception nor did he pursue the matter further with this witness. He next called a police officer who had investigated the death on the evening of its occurrence. This witness identified the gun which he had observed on the kitchen table as being a 22 caliber automatic pistol, designed to fire long rifle bullets. He testified that the broken box of ammunition scattered about the table contained short rifle bullets. The full box originally contained 50 cartridges, all of which were accounted for. The officer counted 47 cartridges on the table and found three in the gun, one of which had been fired. He further noted what appeared to be a few business papers scattered on the table. He noted the presence on the floor beside the table of two empty bottles, each designed to contain a fifth of a gallon of whiskey. He was

permitted to testify that on the evening in question he had a conversation with Emily Hinds as to the events leading up to the shooting of her husband but, upon objection by the plaintiff, was not allowed to state the substance of that conversation. Thereupon, in the absence of the jury, the defendant made an offer to prove by the witness that Emily Hinds freely and voluntarily described to him the events of the evening which culminated when the decedent held the gun against his right temple and pulled the trigger. This proffered evidence was rejected by the court as hearsay. At this point the evidence on both sides was closed and the case submitted to the jury, with what result we have already noted.

In the case of *Cox* v. *Life Insurance Co.*, 139 Me. 167, involving suit on a policy covering accidental death, our court recognized that the burden of proving accident rested upon the claimant throughout the trial and never shifted. The distinction is clearly made in *Watkins* v. *Prudential Insurance Co.* (1934), 315 Pa. 497, 173 A. 644, 95 A. L. R. 869, 875, as "between suits on insurance policies like the one here sued on, which insure against death as a result 'of bodily injuries effected solely through external, violent and accidental means' and suits on those policies which insure against death but which contain a proviso avoiding the policy if the insured dies by his own act." As the court there pointed out, in the former situation the plaintiff has the unremitting burden of proof as to accident, whereas in the latter situation the plaintiff need only prove death while the defendant has from the inception the burden of proof as to suicide which is there raised as an affirmative defense. So in the case before us, the death of the insured person by violent and external means was conceded. The defendant by its pleadings having raised the issue, it remained for the plaintiff to prove by a fair preponderance of the whole evidence that those means were also accidental. *Headlee* v.

*New York Life Ins. Co.* (1943), 12 N. W. (2nd) (S. D.) 313, 315; *Ryan* v. *Metropolitan Life Ins. Co.* (1939), 206 Minn. 562, 289 N. W. 557.

The plaintiff in the first instance was aided by the so-called presumption against suicide. This presumption stems from and is raised by our common knowledge and experience that most sane men possess a natural love of life and an instinct for self-protection which effectively deter them from suicide or the self-infliction of serious bodily injury. It is commonly recognized that there is an affirmative presumption of death by accidental means which arises under appropriate circumstances from the negative presumption against suicide. Whether and to what extent the presumption persists in the face of contrary evidence is a matter of great and even decisive importance in the instant case.

Although a small minority of states adhere to an opposite view, it is now almost universally held that disputable presumptions are not themselves evidence nor are they entitled to be weighed in the scales as evidence. Rather are they recognized as "rules about evidence." They may be distinguished from inferences in that an inference is *permissible,* whereas a presumption is *mandatory.* They compel a finding of the presumed fact in the absence of contrary evidence. They perform the office of locating the burden of going forward with evidence, but having performed that office they *disappear* in the face of countervailing evidence. 20 Am. Jur. 170, Sec. 166; Wigmore on Evidence, 3rd Ed., Vol. IX, Page 286, Sec. 2490 *et seq.;* Anno. 103 A. L. R. 185; 158 A. L. R. 747; 12 A. L. R. (2nd) 1264; *New York Life Ins. Co.* v. *Gamer* (1938), 303 U. S. 161, 58 S. Ct. 500, 114 A. L. R. 1218; *Tyrrell* v. *Prudential Ins. Co. of America* (1937), 109 Vt. 6, 192 A. 184; *Jodoin* v. *Baroody* (1948), 95 N. H. 154, 59 A. (2nd) 343; *Duggan* v. *Bay State St. Ry. Co.* (1918), 230 Mass. 370, 119 N. E. 757; *Moroni* v. *Brawd-*

*ers* (1944), 317 Mass. 48, 57 N. E. (2nd) 14; *Hill* v. *Cabral* (1938), 62 R. I. 11, 2 A. (2nd) 482; *Smith* v. *Tompkins* (1932), 52 R. I. 434, 161 A. 221; *Carson* v. *Metropolitan Life Ins. Co.* (1956), 165 Ohio St. 238, 135 N. E. (2nd) 259.

The minority view that the presumption is itself evidence or has evidentiary weight has its adherents among the courts, some of which have felt constrained to that result by judicial interpretation of applicable statutes. *Smellie* v. *Southern Pacific Co.* (1931), 212 Cal. 540, 299 P. 529; see *Speck v. Sarver* (1942), 128 P. (2nd) (Cal.) 16; *Wyckoff* v. *Mut. Life Ins. Co. of N. Y.* (1944), 147 P. (2nd) (Or.) 227; see *Lewis* v. *N. Y. Life Ins. Co.* (1942), 124 P. (2nd) (Mont.) 579; *Allison* v. *Bankers Life Co.* (1941), 230 Iowa 995, 299 N. W. 889; *Mutual Life Ins. Co. of N. Y.* v. *Maddox* (1930), 128 So. (Ala.) 383. No statute exists in Maine declaring that disputable presumptions are themselves evidence.

Although our own court has never found it necessary to contribute any extended academic discussion to the plethora of words which have been written on this controversial subject, we find no satisfactory indication from the language used, confusing though it may be, that our court has accepted the principle that presumptions are themselves evidence. In *Moriarty's Case,* 126 Me. 358, 361, the court first referred to the presumption against suicide as having "probative force," but in the next breath spoke of it as serving "in the place of evidence, until prima facie evidence is adduced by the opposite party." In *Henderson* v. *Berce,* 142 Me. 242, the presumption was "destroyed" by competent evidence. In *Eisenman* v. *Austen, Ex'r.,* 132 Me. 214, 215, our court used the phrase "a mere presumption" with the evident intention of emphasizing the contrast between a presumption and evidence. And in *Benson* v. *Town of Newfield,* 136 Me. 23, 30, the court, speaking of the presumption that public officials have properly performed their duties,

stated: "Still, it is *only* a presumption and may be rebutted by the introduction of evidence." (Emphasis supplied.) So also in *Hill* v. *Wiles*, 113 Me. 60, the treatment accorded the presumption was inconsistent with any concept that a presumption is itself evidence. Although we find no indication that the issue has ever been carefully considered, we are aware that in a few of the older cases there are expressions by way of dicta which suggest a contrary view. See *Knowles* v. *Scribner*, 57 Me. 495, 498; *Ellis* v. *Buzzell*, 60 Me. 209; and *Decker* v. *Somerset Ins. Co.*, 66 Me. 406. Each of these cases holds that one asserting a claim or an affirmative defense in a civil case which in effect charges criminal conduct need only prove it by a preponderance of the evidence. Proof beyond a reasonable doubt is required only in criminal cases. In determining whether evidence preponderates, the factfinder must of course scrutinize it in the light of common sense and common experience including the relative unlikelihood of criminal conduct. *Colby* v. *Richards*, 118 Me. 288. Gratuitous expressions seeming to accord presumptions evidentiary weight in the scales were at best superfluous and at worst incorrect. We now hold unequivocally that presumptions serve their allotted procedural purpose but are not themselves evidence.

A far more difficult and troublesome question arises, however, in determining what quantum or quality of evidence is required to cause a rebuttable presumption to disappear. Conversely, to what extent will such a presumption persist in the face of contrary evidence? And who is to evaluate that evidence, the trial judge or the jury? It is at this point that courts have gone their several ways and too often semantics have been substituted for logic. On the one hand is the risk that the jury may be confused by instructions relating to presumptions and may misapply them, especially by according to presumptions artificial evidentiary weight in the scales which they do not possess. On the other hand

is the concern expressed by many writers of opinion and texts that if the presumption be regarded purely as a procedural tool *in the hands of the trial judge,* he will have in effect usurped the province of the jury as factfinder in determining the weight and credibility of such evidence as tends to negative the presumed fact. Efforts to reconcile these two desirable objectives have produced both compromise and confusion.

Many courts have adopted what is usually referred to as the Thayer theory of rebuttal which provides that disputable presumptions (other than the presumption of legitimacy) fall as a matter of law when evidence has been introduced which would support a finding of the non-existence of the presumed fact. This rule has the virtue of uniformity and won approval in the American Law Institute, Model Code of Evidence, Rules 703 and 704. In the foreword of the Model Code, Professor Edmund M. Morgan, the reporter and a recognized authority in the field of evidence and procedure, makes this excellent analysis of the several views (page 55):

"As to the other consequences of the establishment of the basic fact, save only the basic fact of the presumption of legitimacy, the opinions reveal at least eight variant views, of which the following are the most important:

1. The existence of the presumed fact must be assumed unless and until evidence has been introduced *which would justify a jury in finding the non-existence of the presumed fact.* When once such evidence has been introduced, the existence or non-existence of the presumed fact is to be determined exactly as if no presumption had ever been operative in the action; indeed, as if no such concept as a presumption had ever been known to the courts. *Whether the judge or the jury believes or disbelieves the opposing evidence thus introduced is entirely immaterial.*

In other words, the sole effect of the presumption is to cause the establishment of the basic fact to put upon the party asserting the non-existence of the presumed fact the risk of the non-introduction of evidence which would support a finding of its non-existence. This may be called the *pure Thayerian rule,* for if he did not invent it, he first clearly expounded it.

2. The existence of the presumed fact must be assumed unless and until evidence has been introduced which would justify a jury in finding the non-existence of the presumed fact. When such evidence has been introduced, the existence or non-existence of the presumed fact is a question for the jury unless and until *'substantial evidence' of the non-existence of the presumed fact has been introduced. When such substantial evidence has been introduced, the existence or non-existence of the presumed fact is to be decided as if no presumption had ever been operative in the action.* Thus if the basic fact, by itself or in connection with other evidence, would rationally support a finding of the presumed fact, the existence or non-existence of the presumed fact is a question for the jury; if the basic fact is the only evidence of the presumed fact and would not rationally justify a finding of the presumed fact, the judge directs the jury to find the non-existence of the presumed fact. *Unfortunately the cases which support this rule do not define substantial evidence: it is certainly more than enough to justify a finding; sometimes it seems to be such evidence as would ordinarily require a directed verdict.*
* * *

3. The existence of the presumed fact must be assumed *unless and until the evidence of its non-existence convinces the jury that its non-existence is at least as probable as its existence.* This is sometimes expressed as requiring evidence which balances the presumption.

4. The existence of the presumed fact must be assumed unless and until the jury finds *that the non-existence of the presumed fact is more probable than its existence.* In other words the presumption puts upon the party alleging the non-existence of the presumed fact both the burden of producing evidence and *the burden of persuasion of its non-*existence. This is sometimes called the Pennsylvania rule." (Emphasis supplied.)

Professor Morgan and his distinguished colleague, Professor John M. Maguire, have never concealed their preference for some form of the fourth of the foregoing variants which would involve the shifting of the burden of *persuasion* at least as to certain classifications of presumptions, if not as to all. See Maguire on Evidence, Common Sense and Common Law, page 187; Model Code of Evidence, page 57; Morgan, Some Problems of Proof, page 81; Morgan, Presumptions and Burden of Proof, 47 Harvard Law Review 59; Morgan and Maguire, Looking Backward and Forward at Evidence, 50 Harvard Law Review 909, 913. This concept was finally approved by both the American Bar Association and the American Law Institute in 1954 and appears as Rule 14 of the Uniform Rules of Evidence promulgated by the National Conference of Commissioners on Uniform State Laws. That rule is as follows:

"Rule 14. *Effect of Presumptions.* Subject to Rule 16, and except for presumptions which are conclusive or irrefutable under the rules of law from which they arise, (a) if the facts from which the presumption is derived have any probative value as evidence of the existence of the presumed fact, the presumption continues to exist *and the burden of establishing the non-existence of the presumed fact* is upon the party against whom the presumption operates, (b) if the facts from which the presumption arises have no probative value as evidence of the presumed fact, the presumption does not exist when evidence is introduced *which*

*would support a finding of the non-existence of the presumed fact,* and the fact which would otherwise be presumed shall be determined from the evidence exactly as if no presumption was or had ever been involved." (Emphasis supplied.)

Jones on Evidence, 5th Ed., Vol. 4, page 1903 (see Comment, page 1904).

It will be noted that the proposed rule classifies presumptions, applying the Thayerian Rule to those situations where the presumption is raised out of expediency and the basic facts have no tendency to prove the presumed fact, and applying the so-called .Pennsylvania Rule to those situations where the basic facts have probative value as evidence of the presumed fact. Thus far, obviously, the rule remains virtually untried and we have no adequate information available as to the extent to which it may have found favor with the courts. In *Alliance Assurance Co.* v. *U. S.* (1958), 252 F. (2nd) 529, 535, the court specifically adopted Rule 14 and held that the burden of persuasion was shifted by the presumption of negligence of a bailee. In doing so, the court felt constrained to attempt to distinguish the case of *Commercial Molasses Corp.* v. *New York T. Barge Corp.* (1941), 314 U. S. 104, 62 S. Ct. 156, in which the presumption was said to disappear in the face of evidence "sufficient to persuade that the non-existence of the (presumed) fact * * * is as probable as its existence." The latter rule, it will be noted, is the third of Morgan's variants as stated above.

If we have, as we believe, because of the conflicting expressions and the lack of any definitive announcement in our own opinions, some freedom in determining what procedural effect we will assign to disputable presumptions, some examination of the cases which have employed the several variants may be helpful.

In the leading case of *New York Ins. Co.* v. *Gamer, supra,* the court, without reviewing the evidence, pronounced that

portion of it which was adverse to the presumption (of death by accidental means) to be "sufficient to sustain a finding that the death was not due to accident" in accordance with the Thayerian concept. It held that upon the introduction of this quantum of evidence, the presumption disappeared as a matter of law and should not have reached the jury. Mr. Justice Black, dissenting, first criticized the majority for its application of Montana law which in his view required that the presumption persist until the contrary evidence " '*all* points to suicide * * * with such certainty as to preclude any other reasonable hypothesis.' " He then expressed his concern over the method of determination by saying: "The *jury*—not the *judge*—should decide when there has been 'substantial' evidence which overcomes the previous adequate proof."

It has frequently been stated that a disputable presumption disappears in the face of "substantial countervailing evidence" and the case is thereafter in the hands of the jury free of any presumption. As previously noted, what is meant by "substantial," however, is not always clear. In *Alpine Forwarding Co.* v. *Penn. R. Co.* (1932), 60 F. (2nd) 734, another case which has been often cited, L. Hand, J. held that the determination as to whether the evidence contrary to the presumed fact is "substantial" is always and solely for the trial judge, and that in a properly conducted trial the presumption will never be mentioned to the jury at all. The same writer, speaking for a divided court in *Pariso* v. *Towse* (1930), 45 F. (2nd) 962, although satisfied that the unqualified denials of the presumed fact by the defendant and her somewhat interested nephew should cause the presumption to disappear as a matter of law, felt constrained by his interpretation of applicable New York law to hold in effect that the denials of a party corroborated by an interested witness are not such "substantial" evidence as will cause the disappearance of the presumption as a

362

matter of law. The credibility of these defense witnesses therefore became an issue for the jury. Swan, J., dissenting, was not satisfied that New York law required such a result. Contrast *Bradley* v. *S. L. Savidge, Inc.* (1942), 123 P. (2nd) (Wash.) 780, in which it was held immaterial whether the evidence came from interested or disinterested witnesses.

The New York court in *Chaika* v. *Vandenberg* (1929), 252 N. Y. 101, 169 N. E. 103, concluded that the presumption did not disappear in the face of the uncorroborated but uncontradicted denial of an interested party, but rather the credibility of such witness became an issue for the factfinder. Thus is presented a negative element in the definition of what constitutes "substantial" evidence. Cf. *Gaudreau* v. *Eclipse Pioneer Div. of Bendix Air Corp.* (1948), 61 A. (2nd) (N. J.) 227; *Barwick* v. *Walden* (1944), 32 S. E. (2nd) (Ga.) 401.

The often cited case of *McIver* v. *Schwartz* (1929), 50 R. I. 68, 145 A. 101, involved the uncorroborated denial of the defendant which was not believed by either the trial judge or the jury. Affirming the principle that a presumption disappears as a matter of law in the face of "any credible evidence to the contrary," the court upset a jury verdict for the plaintiff. It would appear that "any credible evidence" here meant "any believable evidence even though not in fact believed by anyone."

Reaching an opposite conclusion, however, at least with respect to certain classes of presumptions, are such cases as *O'Dea* v. *Amodeo* (1934), 118 Conn. 58, 170 A. 486; *Koops* v. *Gregg* (1943), 130 Conn. 185, 32 A. (2nd) 653; and *United States* v. *Tot* (1942), 131 F. (2nd) 261, 267, which seem to require that the requisite contrary evidence must be in fact believed and any question of veracity raises an issue for the factfinder. The latter opinion voices the

criticism which has often been made of the pure Thayerian rule that a presumption should not fall merely because words are uttered which nobody believes. "A gentle tapping on a window pane will not break it; so a mere attempt to refute a presumption should not cause it to vanish, if it is of any value at all." *Hildebrand* v. *Chicago, B. & Q. R. R.* (1933), 17 P. (2nd) (Wyo.) 651, 657. See Anno. 5 A. L. R. (2nd) 196 and cases cited reflecting the diversity of opinion on this subject.

*O'Dea* v. *Amodeo, supra,* established an elaborate classification of disputable presumptions with a prescribed rebuttal requirement for each classification. It does not appear that this method of approach has won any substantial following, perhaps because of the practical difficulties which might arise in applying the rule on a case by case basis in the trial courts.

Amid so much confusion there is the natural temptation toward over-simplification. Nevertheless, if the presumption is to be a useful procedural tool in the hands of the trial court, relative simplicity is a desirable goal. In the article in 47 Harvard Law Review 59 already cited, Professor Morgan has made a thorough and helpful analysis of this troublesome problem. As he points out, rebuttable presumptions have been created "(a) to furnish an escape from an otherwise inescapable dilemma or to work a purely procedural convenience, (b) to require the litigant to whom information as to the facts is the more easily accessible to make them known, (c) to make more likely a finding in accord with the balance of probability, or (d) to encourage a finding consonant with the judicial judgment as to sound social policy." Although the purposes for which presumptions are raised might properly and logically affect the method of their rebuttal, the writer, while suggesting that they should be permitted to shift the burden of persuasion, sees no serious or insurmountable objection to the establish-

ment of a single procedural rule that a disputable presumption persists until the contrary evidence persuades the factfinder that the balance of probabilities is in equilibrium, or, stated otherwise, until the evidence satisfies the jury or factfinder that it is as probable that the presumed fact does not exist as that it does exist. We view the adoption of such a rule as a practical solution of a confusing procedural problem. In establishing the vanishing point for presumptions, it provides more certainty than do the varying definitions of "substantial countervailing evidence." It has also the virtue of reserving to the factfinder decisions as to veracity, memory and weight of testimony whenever they are in issue. In essence, the proposed rule recognizes that when an inference has hardened into a presumption compelling a finding in the absence of contrary evidence, it has achieved a status which should not vanish at the first "tapping on the window pane." It recognizes that "surely the courts do not raise such a presumption merely for the purpose of making the opponent of the presumption cause words to be uttered." We agree with Mr. Morgan that our objective should be to devise a "simple, sensible and workable" plan for the procedural use of disputable presumptions and are satisfied that the suggested rule achieves that end.

Such a rule gives to the presumption itself maximum coercive force short of *shifting the burden of persuasion.* Although we are keenly aware that there is severe criticism by respected authority of the widely accepted rule that the burden of persuasion on an issue never shifts, that rule has been thoroughly imbedded in the law of this state. An unbroken line of judicial pronouncements to this effect are to be found in our opinions. We would be most reluctant to make a radical change in the accepted rule unless forced to do so by some compelling logic. We feel no such compulsion here. Logic compels the conclusion that a mere procedural device is not itself evidence. But beyond that there seems

to be a certain amount of judicial latitude which permits the court to determine how a disputable presumption, necessarily artificial in its nature, can best perform a useful function in forwarding the course of a trial. As already noted, it seems pointless to create a presumption and endow it with coercive force, only to allow it to vanish in the face of evidence of dubious weight or credibility. Neither does it seem to us necessary, in order to bring some order out of chaos, to overrule all precedent and permit the presumption to shift the burden of persuasion from him who first proposes the issue and seeks to change the *status quo*. These considerations prompt us to adopt the foregoing rule which seems to us a satisfactory middle course.

In our review of many opinions on this subject, we have discovered no more careful or accurate an analysis than is contained in a dissenting opinion by Mr. Justice Traynor appearing in *Speck* v. *Sarver, supra,* at page 19. Endorsing the view which we take of the effect of rebuttable presumptions as the "sounder one," he states: "Once such evidence (contrary to the presumed fact) is produced and believed, the jury should weigh it against any evidence introduced in support of the facts presumed and decide in favor of the party against whom the presumption operates if it believes that the non-existence of the facts is as probable as their existence. Nothing need be said about weighing the presumption as evidence."

With respect to the presumption against suicide in particular, Mr. Justice Taft concurring in *Carson* v. *Metropolitan Life Ins. Co., supra,* said: "There may be instances where the only evidence produced or introduced to rebut the presumption against suicide is evidence which the jury may quite properly disbelieve in exercising its function as trier of the facts and judge of the credibility of the witnesses. In such an instance, if the rule is as broadly stated as is suggested * * * then incredible evidence or evidence

having no weight whatever could be effective in making the presumption against suicide disappear. Obviously, that would be unreasonable.

"There may therefore be instances where it will be necessary for the trial court to mention the presumption against suicide in charging a jury, even though it is erroneous to advise the jury * * * that that presumption may be weighed as evidence."

The rule for which we have expressed preference does not, as we interpret it, mean that the persistence or disappearance of a disputable presumption may never be resolved as a matter of law. Whenever no countervailing evidence is offered or that which is offered is but a scintilla, or amounts to no more than speculation and surmise, the presumed fact will stand as though proven and the jury will be so instructed. On the other hand, when the contrary evidence comes from such sources and is of such a nature that rational and unprejudiced minds could not reasonably or properly differ as to the non-existence of the presumed fact, the presumption will disappear as a matter of law. Where proof of the presumed fact is an essential element of the plaintiff's case, he would suffer the consequence of a directed verdict. Such would ordinarily be the result, for example, when evidence effectively rebutting the presumption is drawn from admissions by the plaintiff, evidence from witnesses presented and vouched for by the plaintiff, or from uncontroverted physical or documentary evidence.

Regardless of the view taken of the procedural effect of the presumption of death by accidental means, courts have not failed to be impressed by undisputed evidence of physical facts negativing accident. In *Mitchell* v. *New England Mut. Life Ins. Co.* (1941), 123 F. (2nd) 246, the court, noting a contact wound and the horizontal course of the shot, concluded that "the nature of the wound itself bars any reasonable hypothesis of accident." See also *Gem City Life*

*Ins. Co.* v. *Stripling* (1933), 168 S. E. (Ga.) 20; *McMillan* v. *Gen'l American Life Ins. Co.* (1940), 9 S. E. (2nd) (S. C.) 562; *Long* v. *Metropolitan Life Ins. Co.* (1956), 90 S. E. (2nd) (S. C.) 915; *Carroll* v. *Prudential Ins. Co. of America* (1940), 125 N. J. L. 397, 15 A. (2nd) 810. Upon facts bearing a striking similarity to those of the instant case, the court held in *Travelers Ins. Co.* v. *Wilkes* (1935), 76 F. (2nd) 701, that a verdict for the plaintiff beneficiary could not be sustained. In that case the decedent died as the result of a contact wound in the right side of his head made by a gun found at his side. The course of the bullet was about horizontal but slightly upward. There were no indications of a struggle. The decedent's financial condition, although not good, was not desperate, and he was apparently living happily with his wife. Three empty whiskey bottles were found in the room where he was killed. The court concluded that on this evidence of undisputed physical facts, a finding of death by accidental means could not reasonably be made.

Bearing in mind the sage admonition of Chief Justice Clark, dissenting in *McDowell* v. *Norfolk S. R. Co.* (1923), 186 N. C. 571, 120 S. E. 205, that too much technical and procedural "hair splitting" may impede the orderly course of litigation, let us turn to the facts before us. Applying the above stated rules of law to the facts of the instant case, it becomes at once apparent that the verdict of the jury was erroneous. As has been noted, the plaintiff undertook to satisfy his burden of proof, that is, the risk of non-persuasion, that the death was caused by violent, external and accidental means. In the initial stages of the presentation of the plaintiff's case, there was undisputed and conclusive evidence that the means of death were both violent and external. Momentarily, as to the required proof of accidental means, the plaintiff was aided by the presumption, and the burden of going forward with evidence (as distin-

guished from the burden of proof) on this element of the case at once shifted to the defendant. This burden, however, could be as well satisfied by evidence adduced from plaintiff's witnesses as from those produced by the defendant. As the presentation of the plaintiff's main case proceeded, evidence of physical facts, emanating from the plaintiff's own witnesses and never disputed, clearly depicted an intentional, self-inflicted injury resulting in death. This evidence must be assessed in the light of inherent probabilities. Most significant is the fact that this was a *contact* wound at the right temple. Moreover, the course of the bullet on a horizontal plane through the head conclusively completes the picture of a fatal shot fired from a revolver held at and against the right temple and in a horizontal position. It is apparent that this evidence tends effectively to rule out any reasonable likelihood that there was an accidental discharge of the firearm while being cleaned or handled by either the decedent or his wife. The only reasonable inference is that the decedent placed a loaded revolver against his right temple and pulled the trigger. It matters not whether in so doing he intended to take his own life or was performing a grossly negligent and dangerous act reasonably calculated to produce grievous bodily harm or death. Where a shooting is the natural and probable consequence of the acts of the decedent, the result which should have been anticipated can hardly be termed an accident. *Beckley Nat. Exchange Bank* v. *Provident Life & Accident Ins. Co.* (1939), 2 S. E. (2nd) (W. Va.) 256; *Aetna Life Ins. Co.* v. *Little* (1920), 146 Ark. 70, 225 S. W. 298; *Mutual Life Ins. Co.* v. *Sargent* (1931), 51 F. (2nd) 4. We think the definition employed in *Lickleider* v. *Iowa State Traveling Men's Ass'n.* (1918), 166 N. W. (Iowa) 363, 366 is entirely accurate. "It may be, and it is true, that if the insured does a voluntary act, the natural, usual, and to be expected result of which is to bring injury upon himself, then a death so occurring is not an accident in any sense of

the word, legal or colloquial * * *. To illustrate, A may be foolhardy enough to believe that he can leap from a fourth story window with safety, and, trying it, is killed. * * * In no proper sense of the word is A's death accidental or caused by accidental means * * *." In *U. S. Mutual Acc. Ass'n* v. *Barry* (1889), 131 U. S. 100, 121, 9 S. Ct. 755, the court said: "* * * If a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means." This case and its definition were approved in *Westman's Case*, 118 Me. 133, 141. Whatever the thought processes of the decedent may have been when he placed a loaded revolver at right angles against his temple and pulled the trigger, the tragic results of that act can hardly be said to have been unusual, unexpected or unforeseen.

We note the negative evidence suggesting the absence of any apparent motive for self-destruction. The explanation of the decedent's conduct may well lie in his state of voluntary intoxication. Whatever may have been the reason for his act, we are satisfied that apparent absence of motive *alone* will not suffice under circumstances such as these to support a plaintiff's verdict or even to take the case to the jury. This is so because men without apparent motive do commit suicide and what prompts a man suddenly to succumb or appear to succumb to an access of depression or despair is usually a secret locked in the recesses of his mind. Evidence tending either to demonstrate or negative any motive for self-destruction is always properly received in a case of this sort, but as already noted cannot *alone* suffice against undisputed physical evidence all pointing toward a voluntary act, the natural consequence of which was self-

destruction. See *N. Y. Life Ins. Co.* v. *Trimble* (1934), 69 F. (2nd) 849, 851; *Pilot Life Ins. Co.* v. *Boone* (1956), 236 F. (2nd) 457, 463; *Inghram* v. *National Union* (1897), 103 Iowa 395, 72 N. W. 559.

The evidence offered by the defendant did no more than to bolster the evidence of physical facts which, uncontradicted and unexplained, conclusively destroyed any presumption against the intentional self-infliction of the fatal wound. The plaintiff failed to offer any further evidence tending to show that the decedent met his death other than by his own hand, even though the burden of going forward with evidence on this element of the case had shifted back again to him. Having lost the benefit of the presumption, he was left with nothing to support his theory of accident but the merest surmise and conjecture conjuring up the most unlikely possibilities. Such speculation will not suffice for evidence. With the evidence complete, there was then but one possible verdict which the jury could properly return, and that for the defendant as to the claim for double indemnity.

Why then did the jury reach a verdict so obviously contrary to the evidence? We think the explanation may be found at least in part in the sequel of unusual developments which started when Mrs. Hinds first claimed the privilege against self-incrimination. As these events occurred, two exceptions were noted by the defendant which are now before us, and since this case may be retried, some discussion of the rather novel issues raised may be profitable.

It must be noted at the outset that the witness made her claim of privilege, not as to the particular question then asked, but as to giving any testimony whatever. As previously emphasized, she declined to *"testify."* When another question was asked, after some colloquy with the court, the pending question and *all further questions* of the

witness were excluded. The questions, when viewed as cross-examination, were entirely proper. The witness, although not technically a party to the suit, was so identified in interest with the minor plaintiff, her son and ward for whom she had instigated the action, that her hostility to the defendant could fairly be assumed. The ruling when such privilege is claimed should not be to *exclude* the question if it is otherwise proper and admissible, but merely to grant or refuse the request that the witness not be compelled to answer. See *Gendron* v. *Burnham,* 146 Me. 387, 407. 58 Am. Jur. 54, Sec. 53, states the applicable rule. "The mere fact that the answer to a question might incriminate the witness does not render the question improper, because it is the privilege of the witness to refuse to answer it." Such a request will be honored by the court only when it is satisfied that the danger is real and not fancied or fabricated by the witness, and that the answer, if given, might tend to incriminate the witness. The court must be satisfied that the claim of privilege is made in good faith. 58 Am. Jur. 70, Sec. 81. The witness should not be accorded the privilege as to all further testimony but may properly be expected to claim the privilege on a question by question basis. As was said in *Rogers* v. *U. S.* (1950), 340 U. S. 367, 71 S. Ct. 438, 442: "As to each question to which a claim of privilege is directed, the court must determine whether the answer *to that particular question* would subject the witness to a 'real danger' of * * * crimination." (Emphasis supplied.) Only thus can the examining counsel be afforded a fair opportunity to draw from the witness answers and information which can be given without any incriminating effect whatever. See *Apodaca* v. *Viramontes* (1949), 53 N. M. 514, 212 P. (2nd) 425. Such a process may sometimes be tedious and time consuming, but fortunately the claim of privilege is infrequently made in the trial of civil cases.

Some latitude must be afforded to opposing counsel to show evidence of bad faith on the part of a witness claiming privilege, and the court must be vigilant to pursue any indications of bad faith before granting the privilege. This great constitutional safeguard against self-incrimination was never intended to be used as a means of avoiding the disclosure of the truth by witnesses who only pretend a fear of proving themselves guilty of crime. As stated in 58 Am. Jur. 53, Sec. 50: "It is essential to the existence of the right not to testify that the danger to be apprehended be real and appreciable, with reference to the ordinary operation of law, in the ordinary course of things, not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct. The law does not permit a witness arbitrarily to hide behind a fancied or intangible danger to himself." In the instant case the questions asked were seemingly innocuous. By claiming the privilege when she did, the witness suggested a fear of self-incrimination as to some crime involving her marital status. She was merely asked if she was the wife of the decedent. The fact that she then requested privilege not to testify at all suggests that she may have been making the claim prematurely and without particular reference to the pending question. It may well be that an explanation by the court of the nature of the privilege might have allayed her fears, if indeed any existed, as to the possible results of revealing whether or not she was the wife of the decedent. This would seem to have been a proper case for discreet and cautious examination by the court to ascertain whether any "real danger" of incrimination actually existed.

As has been noted, counsel for the defendant mistook his remedy and abandoned his right to ask further questions of the witness. Instead, he proffered the evidence of the police

officer to whom Mrs. Hinds had related the events of the evening. This he did on the theory that since the best evidence was not available to him, he had a right to resort to secondary hearsay evidence. No case has been called to our attention which recognizes the right to introduce hearsay evidence under such circumstances as these. Whether a valid argument could be made in support of such a position need not be decided here. The defendant had laid no proper basis for the introduction of such evidence in any event. He at no time asked the witness to relate the events of that evening and it cannot now be known with certainty whether or not she would have claimed any privilege as to such a question. If the court erroneously ruled in advance that defendant was precluded from asking such a question, the defendant took no exception to such ruling. We can see at once that if such a question had been asked and a claim of privilege then asserted, the testimony of the officer might properly have been received by the court in the absence of the jury on the issue of the good faith of the witness in claiming privilege. The narrative of events which she gave to the officer suggested no wrongful act on her part. The proffered testimony of the officer, however, would have thrown no light on the good or bad faith of the witness in refusing to answer a question relating only to her marital status. We must constantly bear in mind that no other questions were asked of the witness. Since no proper basis was laid for the introduction of the excluded portion of the officer's testimony, the two exceptions taken in connection with that exclusion must be overruled.

Returning now to the developments in this trial which may have confused the jury, we note the situation which existed when the evidence closed. The jury had heard the only apparent eye witness to the tragedy refuse to "testify," claiming the protection of Art. I, Sec. 6 of the Constitution of Maine. They had seen that action apparently sustained

by the court and acceded to by the defendant. They had no knowledge of the contents of the offer of proof made by the defendant in connection with the proffered testimony of the officer. It is not unreasonable to suppose that the jury may have mistaken these developments for evidence and may have somehow drawn the erroneous inference that Mrs. Hinds had shot her husband. Although no such inference could properly be drawn from her refusal to answer, the impression that such an inference might be raised could easily have been created in the minds of the jury by one of the instructions given by the court. After reminding the jury that a witness had claimed privilege, the court said: "Now such an invocation of the constitutional provision against self-incrimination is not to be taken lightly and a person who invokes that privilege must be assumed to do so in good faith." No further explanatory instructions were given in this connection. Without more, the jury might have understood that they were free to draw such inferences as they chose from the act of the witness in claiming privilege. Obviously it would not have been proper for the jury to have speculated or conjectured that the witness had committed any particular crime, or especially that the witness had shot her husband.

The presiding justice gave the jury to understand that in claiming the privilege, the witness was presumed to have done so in good faith. We know of no such presumption. So many persons have claimed the privilege in recent years for reasons based upon political convictions or upon their personal philosophy as to the proper scope of inquiry and examination rather than upon any honest fear of self-incrimination, that the probabilities that might otherwise have tended to support such a presumption have been greatly diminished. In fact, resort to this great constitutional heritage has been so abused and misused that the claim of privilege is now too often popularly and vulgarly referred

to as "taking the fifth." If we are to preserve this safe-guard for posterity, courts will do well to make no assumptions but rather to make proper inquiry to ascertain as nearly as may be in each case whether or not the privilege is sought in good faith. Doubtless, in this case, the court below had in mind the rule that the acts of men outside the courtroom are ordinarily presumed to have been performed in good faith. This rule, however, has no application to the events of a trial which takes place in the presence of court and jury. The jury is itself witness to the acts and demeanor of those who appear before it and needs the aid of no presumption in determining whether a witness as a participant in the trial is acting in good faith. This situation seems to us analogous to that which was before the court in *Mullaney* v. *C. H. Goss Co.* (1923), 122 A. (Vt.) 430, 432. With respect to the testimony of witnesses before a jury, the court said: "It trenches upon the exclusive province of the jury to determine the credibility of witnesses and the weight to be given to their testimony. The law recognizes no presumption that persons testify truly, and not falsely." The instruction certainly suggested to the jury that the act of claiming privilege was itself a piece of evidence for their consideration. Although no exception was taken to the instruction as given, we think it tended to mislead the jury into drawing the erroneous inference that since Mrs. Hinds claimed the privilege against self-incrimination, she must have shot her husband. We can conceive of no other theory which the jury might have entertained which could rationally explain a verdict so manifestly wrong.

One further factor plays a part in this case and may not be disregarded. As already noted, it is highly improbable that a contact wound on a horizontal plane at the temple was inflicted as a result of clumsy or accidental handling of the gun by Mrs. Hinds. If the act were hers, it would in

the absence of explanation appear to fall into the category of wrongful and criminal conduct. Such conduct is never assumed but must be proven by evidence, in a civil case, which is full, clear and convincing. The total absence of such evidence in this case left no room for inference and could not be compensated for by conjecture.

In conclusion, then, the plaintiff had the burden of persuasion throughout to prove death by violent, external and accidental means. At the close of all the evidence there was an uncontradicted showing by strong evidence of physical facts drawn from disinterested witnesses presented by the plaintiff that death was self-inflicted and non-accidental. The plaintiff, not the defendant, needed the aid of supporting testimony from Mrs. Hinds if he was to satisfy his burden of proof. The plaintiff was left with no proof of accident whatever. Only one verdict was possible and that for the plaintiff in the sum of $9,000.

The entry will be

> *Exceptions overruled. Motion for new trial overruled if plaintiff within 30 days from filing of this mandate remit all of the verdict in excess of $9,000; otherwise motion sustained and new trial granted.*