MARGUERITE KOGER

*v.*

MUTUAL OF OMAHA INS. CO., A MUTUAL INSURANCE COMPANY

(No. 12712)

Submitted May 7, 1968.          Decided June 25, 1968.

*Crockett, Tutwiller & Crockett, J. Strother Crockett,* for appellant.

*Bailey, Worrell, Camper & Viers, Harry G. Camper, Jr.,* for appellee.

BROWNING, JUDGE:

Charles J. Koger, the insured under a policy of health and accident insurance issued by Mutual of Omaha Insurance Company, hereinafter referred to as defendant, died December 5, 1965, as a result of a gunshot wound in the head. The policy contained an accidental death and dismemberment benefit rider which provided, in part: "EXCEPTIONS: Benefits are not payable for loss: . . . (b) resulting from suicide while sane or insane . . . BENEFITS: The company will pay benefits for the following losses which result from injuries incurred by the insured within ninety days after the date of the accident: Loss of Life—principal sum. . . ." Injuries, as defined in the policy, means "accidental bodily injuries . . . which result in loss independently of other causes."

Mrs. Koger, the beneficiary named in the policy, hereinafter referred to as plaintiff, filed a claim for benefits which was denied by the defendant on the ground that Koger's death was not the result of an accident but was the result of his own deliberate act or suicide. Plaintiff then instituted the present action in the Circuit Court of McDowell County to recover under the policy; a jury returned a verdict in her favor in the amount of $5,000.00, and judgment was entered thereon on June 22, 1967, to which this Court granted an appeal and supersedeas on November 27, 1967.

To summarize the evidence, plaintiff testified that she and the deceased had been married for nineteen and one-half years; had two male children, ages nineteen and ten at the time of Mr. Koger's death; lived in their own home which they owned; were free of debt; Mr. Koger earned approximately $10,000.00 a year regularly at his employment; Mr. Koger was forty-three years of age at the time of his death and in good health; and, that they had "a strong and happy family." On December 4, 1965, Mr. Koger went to work at approximately 11:30 p.m., worked his usual shift

and returned to the home at approximately 9:00 a.m.; went to sleep; got up around 3:00 or 4:00 p.m. and went to Welch where he visited Mrs. Koger's sister, returning later that evening. At approximately 1:00 a.m. on December 6, two friends visited him at the home and Koger and his friends had a couple of drinks of whiskey after which plaintiff prepared a meal. It may be noted here that although the testimony of the plaintiff was to the effect that there had been little drinking prior to the meal which she prepared for her husband and his two friends and that Koger was not intoxicated, a photograph of the scene while the deceased's body still lay in the chair shows two empty liquor bottles—one a fifth and one a pint. After eating, the guests left and plaintiff and Koger walked down to a neighbor's house three doors away to get their little boy, returned with him, whereupon the little boy was put to bed and Mr. Koger went to the bedroom where he kept his revolver and obtained the gun, proceeded to the kitchen and removed five bullets from the gun, placing them in a tray. He then returned to the living room and asked plaintiff to play Russian Roulette which she declined to do. At that time the younger son "spoke up and started out" of the front bedroom and "I started in the bedroom to grab the little boy that was coming out." As she started she saw Koger raise the gun in the air and was "messing with it." Within seconds thereafter, although she observed no more, her back being turned, she heard a shot, turned around and saw Koger lying in a chair bleeding from a wound in the head. A deputy sheriff who investigated the occurrence identified photographs which were admitted in evidence showing Koger lying in the chair with a wound in his head, the revolver lying between his feet. He testified that in a statement from plaintiff taken that evening, Mrs. Koger stated: "Charles started arguing with me and he got up and went and got his pistol and said, 'Let's play Russian Roulette,' and I went in the bedroom and I heard him shoot." The county coroner testified that the deceased died of a bullet wound which entered "on the right side of the head, with powder burns about one-eighth of an inch in width, about the puncture

hole, which was located one inch above the upper margin of the ear. The bullet hole was probed and found to go in and slightly upward at about 20 degrees, and made its exit on the left side of the scalp about two inches above the left ear and eight inches from the mid line of the forehead." The doctor further testified that the small one-eighth inch powder burn would indicate that the gun was a "considerable distance from the head"—estimating that the gun was further than a foot and a half or two feet away from the point of entrance when fired—and stated that under the circumstances he could not say whether the firing was accidental or intentional. The cause of death given on the death certificate was "self-inflicted." As heretofore stated the jury returned a verdict in favor of the plaintiff, judgment was entered thereon and the defendant appeals.

This Court perceives no error in the trial of this case unless it be the refusal of the trial court to direct a verdict for the defendant after the completion of all of the evidence in the case. To sustain his position that the trial court properly refused such motion and to uphold the judgment of the trial court upon the verdict of the jury, counsel for the plaintiff cites decisions of this Court, and many could be cited, to the effect that in determining whether the verdict of a jury is supported by the evidence "every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, assumed as true." *Butcher* v. *Stull, et al.,* 140 W. Va. 31, 82 S. E. 2d 278. This statement is contained in *Bower* v. *Brannon,* 141 W. Va. 435, 90 S. E. 2d 342: "However, a decision as to where the province of a jury ends, and that of a court begins, upon questions of fact, must be determined by the evidence in each case. Many well established principles are helpful. If there is no evidence to support the verdict of a jury, or if it is against the plain preponderance of conflicting evidence, it must be set aside. . . . There is no rule or principle of law that can serve as a definite guide post to point the way to

a specific line of demarcation in this nebulous realm where the rights, duties and responsibilities of a court and jury meet. . . ." This is the third syllabus point in *Laxton, Jr. v. Ins. Co.*, 150 W. Va. 598, 148 S. E. 2d 725: "A jury verdict, approved by the trial court, which is against the clear weight and preponderance of the evidence will be set aside on appeal." Of similar import is the single syllabus point in *Speicher, et al.* v. *State Farm Mutual Automobile Ins. Co.*, 151 W. Va. 292, 151 S. E. 2d 684: "A verdict of a jury without evidence to support it, or against the clear weight and preponderance of conflicting evidence, will be set aside by this Court."

Counsel for the plaintiff relies also upon the following statement taken from the opinion in *Martin* v. *Mutual Life Ins. Co.*, 106 W. Va. 533, 146 S. E. 53: "And where it is apparent that the death of the insured resulted from external, and violent means, and the issue is as to whether it was due to an accident within the meaning of the policy, or to some excepted cause, the presumption is in favor of accident and against the existence of facts bringing the case within any of the exceptions contained in the policy." No decision of this Court is cited for that statement. However, this is the second syllabus point in *Beckley Nat'l Exch. Bank* v. *Provident Life & Acc. Ins. Co.*, 121 W. Va. 152, 2 S. E. 2d 256: "When death occurs from unexplained violent and external means, an accident may be presumed; but presumption is excluded when the cause of death is shown. The opinion in *Martin* v. *Ins. Co.*, 106 W. Va. 533, on page 540, is qualified." The *Beckley* decision is cited as authority to sustain the position of the Supreme Court of Maine in the case of *Hinds* v. *Ins. Co.*, 155 Me. 349, 155 A. 2d 721, 85 A.L.R. 2d 703. The Maine Court said: "The only reasonable inference is that the decedent placed a loaded revolver against his right temple and pulled the trigger. It matters not whether in so doing he intended to take his own life or was performing a grossly negligent and dangerous act reasonably calculated to produce grievous bodily harm or death. Where a shooting is the natural and probable consequence of the acts of the decedent, the result which

should have been anticipated, can hardly be termed an accident." See also: *McDaniel* v. *Metropolitan Life Ins. Co.,* 119 W. Va. 650, 195 S. E. 597. In *Sizemore* v. *National Casualty Co.,* 108 W. Va. 550, 151 S. E. 841, this Court strictly construed the language "accident" or "accidental" in an insurance policy in holding that where the assured, a deputy sheriff, was killed when he jumped from a moving vehicle in an effort to apprehend an escaped prisoner, was not accidentally killed within the meaning of the policy.

The only case that is cited or that we have found that is directly in point, assuming that the evidence in this case as a matter of law shows that the deceased was killed while playing "Russian Roulette," is *Thompson* v. *Prudential Ins. Co.,* 84 Ga. App. 214 (1951), 66 S. E. 2d 119. In that case the trial court directed a verdict for the defendant under the provisions of a life insurance policy providing for payment of double indemnity for accidental death and the Supreme Court of Georgia sustained the action of the trial court and said:

> ". . . where one engages in a game of Russian Roulette in which all but one of the cartridges are removed from the cylinder of a revolver, the cylinder is spun, the revolver is placed by the participant to his head, and the trigger is voluntarily pulled without ascertaining the position of the cartridge in the chamber in its relation to the firing mechanism, and it occurs that when the trigger is pulled the gun fires and kills or injures the participant, his death or injury is no less intentional than had the gun been fully loaded and his death or injury cannot be said to have been the result of accident or effected by accidental means. In such a case, it will be presumed that the participant intended that he should be killed or injured should fate stop the cartridge in the spinning cylinder in firing position. One engaging in such a bizarre past-time with a lethal weapon, if he be compos mentis, knows that he is courting death or severe injury, and will be held to have intended such obvious, and well known results, if he is killed or injured. . . . Such reckless abandon and exposure to a known, and obvious danger cannot be said to have been accidental, nor can it be said that his death was effected by acci-

dental means. The most that can be said for such a participant is that he hoped the cartridge would not stop in the firing position when his turn to pull the trigger came. Under these circumstances we think the plaintiff failed to establish that the insured's death was effected by accidental means within the meaning of that term in the policies of insurance and it follows that the trial court did not err in directing a verdict for the defendant, nor in overruling the motion for a new trial."

As heretofore stated, the insurance policy involved herein covered only death as a result of accidental bodily injury. In her complaint the plaintiff alleged that her husband's death was due to such and the burden was upon her to prove that allegation by a preponderance of the evidence. Therefore, assuming that "the cause of death was explained" by the evidence as a matter of law, as stated in the *Beckley* case, "there was no place for presumption; . . ." Counsel for the plaintiff relies strongly upon the fact that no witness saw the deceased shoot himself and upon the evidence of the coroner, who, upon cross-examination, was asked this question and gave the following answer: "Q. Of course, if the bullet wound were self-inflicted, the gun would have to be within a few inches of his head, eight inches or a foot away? A. I would be inclined to think that, I mean the gun was further than a foot and a half or two feet away from the point of entrance when it went in or you would have had more powder burn there." The post mortem examination was made ten days after burial—after the body was exhumed—and the coroner stated on the death certificate the cause of death as "self inflicted". He was asked on re-direct examination if he knew whether the wound was accidentally or intentionally inflicted and answered in the negative.

Actually there is little conflict in the evidence in this case and the question before this Court is whether that evidence is such as to sustain the verdict of the jury and the judgment which was entered upon it. The deceased and his wife, the plaintiff in this case, owned and occupied a four-room one-story house apparently laid out in the form of a square, the living room and one bedroom adjoining at the

front of the house, with the kitchen adjoining the living room to the rear and a second bedroom to the rear of the front bedroom. There is a doorway between the kitchen and the living room, the living room and the front bedroom, and the kitchen and the back bedroom but none between the two bedrooms. In her pre-trial deposition which it was agreed could be used for "the purpose of discovery, or for use as evidence in said case, or for both purposes," the plaintiff clearly stated that her husband took a gun from where it was hanging on a nail in the front bedroom, walked across the living room, entered the kitchen and that she heard something, which she later discovered was five cartridges, dropping into a silver tray. The revolver contained six loaded cartridges, one remaining therein. She stated that her husband invited her to play Russian Roulette and that she knew well what that phrase meant. She further stated that as she walked through the living room she saw her husband "put the gun up and twirl it". She further stated that she saw him "spin the magazine". In direct examination at the trial she said he "was messing with" and "fooling with" the gun. From her description of her location in the living room at that time, no more than two or three seconds could have elapsed until she heard a shot fired behind her and saw her husband slumped in a chair with his head on the left arm thereof and a bullet wound in his head. The time element is obvious from her statement that she had only reached the door separating the front bedroom from the living room when the shot was fired. As heretofore stated, the bullet entered the deceased's head about an inch above the right ear and emerged approximately two inches above the left ear. The testimony of the deputy sheriff, Jarrell L. Smith, who came to the Koger home to investigate the shooting, as well as photographs made by him and introduced at the trial, show that there was a bullet hole in the mantel to the left of the chair in which the deceased was found. Counsel for the plaintiff has contended in brief and oral argument that inasmuch as the death weapon was a .38 caliber revolver containing a hammer which obviously was resting upon a loaded cartridge in the cham-

ber that the jury had evidence before it from which it could have found that the deceased dropped the gun to the floor, the concussion caused the bullet to be fired thus killing the deceased. The place of entry of the bullet into the mantel and the course of the bullet through the head of the decedent make such an occurrence physically impossible. Furthermore, upon the facts of this case, it is the view of this Court that the testimony of the coroner is subject to the same infirmity. The deceased could not have held the gun two feet away from the point where the bullet struck his head and fired it at the angle which the evidence shows beyond doubt it must have been fired. That leaves only the possibility that, if Koger did not commit suicide or was not killed while engaged in the precarious and ridiculous "game" of Russian Roulette, either of which would be intentional and not accidental, he was shot by some other person. The only other person in the room was the plaintiff and her evidence will not permit of such a conclusion, nor is there the slightest contention therefor.

It is the view of this Court that as a matter of law the evidence was not sufficient to sustain the verdict for the plaintiff and that it was reversible error for the trial court to enter judgment upon it. The judgment of the Circuit Court of McDowell County is reversed.

*Reversed.*