**STATE of Maine**

v.

**Robert William ROBBINS.**

Supreme Judicial Court of Maine.

April 3, 1974.

Robert S. Raymond, Asst. Atty. Gen., Augusta, for plaintiff.

Nisbet, MacNichol & Ludwig by Alexander MacNichol, South Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WEATHERBEE, Justice.

On the afternoon of March 22, 1972 the lifeless body of Edmund Feldman was found lying on the bed in his Portland hotel room. The shaft of a screwdriver was protruding from the victim's chest. A doctor subsequently fixed the time of death as Sunday evening, March 19.

On Thursday, March 23, one Edith Champagne told the Portland Police that a house guest named Richard Ross had told her early Monday morning that he had killed a man with a screwdriver in the Plaza Hotel on Sunday evening. She related in her statement that Ross came to her home very drunk late that Sunday night and later told her a vague story of committing a murder and showed her $200 in cash. Believing he was lying, Mrs. Champagne did not make a report to the police until Thursday after she had read the newspapers' first reports of the murder.

Two days later, on March 25, apparently as a result of her statement, Richard Ross was arrested by police in Portland. Ross first denied that he had taken part in the murder. Later, however, he changed his story and stated that Robert Robbins, the Defendant here, had murdered Feldman and had forced Ross to remove Feldman's money from envelopes in the man's hotel room, and that Ross had received some of the money.

Richard Ross and Mrs. Champagne testified at the May Term before the Cumberland County grand jury which indicted both Ross and Robbins for murder. Ross testified for the State in Superior Court at Robbins' trial. Mrs. Champagne was also a witness, called by the defense, but she refused to answer most of the questions put to her. The jury convicted Robbins of murder, and from this judgment he has appealed to this Court. We sustain his appeal and order a new trial.

The Appellant propounds five arguments on appeal, four of which deal specifically with the constitutional privilege against self-incrimination. In this opinion we will discuss only the self-incrimination issues which will prove dispositive of this appeal and we do not find it necessary to examine the fifth claim of error.

The Appellant claims that the trial Court erred because (1) it allowed Edith Champagne to invoke the privilege against self-incrimination based on an improper standard; (2) it allowed Mrs. Champagne to use the privilege after she made out-of-

court statements tending to show an ulterior motive in claiming the right not to testify; (3) it permitted Mrs. Champagne to make use of the privilege after the Court had a chance to examine her previous grand jury testimony which showed that no factual basis existed for her use of the privilege; (4) it disallowed the introduction into evidence of Edith Champagne's grand jury testimony after she had been permitted to invoke the privilege against self-incrimination and to decline to testify. Our entire discussion of the self-incrimination issue will touch on each of the above four aspects presented by the Defendant. We will first relate the background circumstances against which the claim of privilege arose.

A joint probable cause hearing for Ross and Robbins was held in Portland at the District Court on May 1 and 8, 1972. Ross did not testify there, and it appears from the Defendant's brief that Edith Champagne refused to answer certain questions due to possible self-incrimination. On May 9, both Ross and Mrs. Champagne testified at grand jury proceedings. At that time Ross, who at this point was being charged with the murder, had an attorney and waived his right not to testify after appropriate warnings from the prosecution. The record does not disclose that warnings were given to Mrs. Champagne who was apparently never considered to have been implicated in the crime. She testified and answered every question asked her by the State.

Mrs. Champagne testified under oath that early Monday morning, March 20, Richard Ross told her at her home that he "did somebody in" with a screwdriver at the Plaza Hotel. He said that another person was also involved but did not name him. He also spoke vaguely of the difficulties of stabbing a person with a butter knife. She testified that Ross had also stated that he had been paid to kill the man who supposedly had raped a young girl. Her testimony revealed that Ross showed her two hundred dollars on that Monday morning. She said Ross was very drunk and she did not believe he was telling the truth. Ross left town for a few days, and it was during this interval that Mrs. Champagne read of the murder and went immediately to the police.

Ross also testified at the grand jury, but his statements at that time were inconsistent with those related by Mrs. Champagne. He stated that he and Robbins were together drinking on the afternoon of March 19, 1972. Robbins told Ross that a man at the Plaza Hotel might put them both to work on a construction job. Ross testified that he followed Robbins to the hotel. Both proceeded upstairs to the man's room, Robbins entering the room while Ross waited in the hall for over a half hour. When Robbins came out of the room, he directed Ross into the room where Ross found a man lying on the floor, dead, with a bloodstain on his shirt and a "metal thing" in his chest. Ross said that he tried to call the police, but Robbins pulled a gun on him and threatened him. At Robbins' request, Ross then emptied money from several envelopes found in the room into a bag. At gunpoint Ross wiped the room clean of fingerprints and then went into the hall, followed a few minutes later by Robbins. Ross stated that the two left the building and walked through town to a restaurant where Robbins' wife worked. There Ross received $106 from an envelope then in Robbins' possession.

The grand jury indicted both Ross and Robbins for murder and Robbins' trial took place a few months later. The State presented Ross as a witness in the trial of Robbins. After waiving his right to remain silent, Ross now stated that he and Robbins had gone to the hotel to collect money which was owed Robbins by a resident at the hotel. Otherwise, his description of the events surrounding the murder was generally consistent with that which he had given the grand jury, but given in greater detail. He admitted returning drunk to Edith Champagne's house where

he had been staying for three or four weeks and telling her "some parts of the incident".

The State produced witnesses who told of an unusual display of wealth by the two men when they returned to the bar to resume their drinking after a brief absence. It is clear, however, that the conviction of Robbins must have rested in large part upon the testimony of Ross.

After the State rested, the Defendant called Mrs. Champagne as a witness and sought to attack the reliability of Ross' testimony by presenting to the jury Mrs. Champagne's account of his admissions to her early Monday morning in which he allegedly had said he had done the actual killing. As to this the Defendant encountered several barriers which form the principal bases for the Defendant's appeal. Mrs. Champagne claimed the privilege against self-incrimination. The Presiding Justice refused to order Mrs. Champagne to answer most of the questions asked by Defendant's counsel. Defendant's counsel then sought unsuccessfully to introduce an out-of-court statement by Mrs. Champagne which would tend to show a lack of sincerity in her claim of the privilege. Finally, Defendant's counsel attempted to present to the jury the transcript of Mrs. Champagne's grand jury testimony.

■ Certainly Mrs. Champagne's testimony that Ross had made a statement to her shortly after the murder, inconsistent with his trial testimony and tending to exonerate Robbins, would have been relevant and important to Robbins' defense. If, in fact, Mrs. Champagne could have given such testimony, Robbins urges us that he was entitled to be aided by the Court in compelling the reluctant witness to reveal the inconsistent statement. Our guarantee of fair trial under the "law of the land" (Me.Const. art. I, § 6) assures him of the right to present the testimony of witnesses

in his behalf, but this assurance is necessarily subject to the effects of possible application of other constitutional principles. Here, we must also be concerned with the constitutional right of the witness to claim the privilege of declining to answer questions which might, if answered, incriminate her. So, for the first time, we are called upon to attempt to reconcile the conflict between the defendant's right to testimony in his defense and the witness' claim of the privilege of silence.

■ The problem created by a conflict between the *State's* need for a witness' testimony and the danger of such testimony incriminating the witness is not unknown here. Gendron v. Burnham, 146 Me. 387, 82 A.2d 773 (1951). To a considerable extent, at least, it has been alleviated by the enactment of 15 M.R.S.A. § 1314–A which permits the State to grant immunity from prosecution to the witness whose otherwise incriminating testimony it seeks to obtain.

The situation here is even more deeply disturbing. Two individuals—one charged with crime and the other called as a witness in his defense—each demand assistance of the Court in protecting constitutional rights which may prove to be impossible of complete observance.

*Mrs. Champagne's claim of the privilege against self-incrimination*

Mrs. Champagne was called to the stand by the defense and, after giving her name and address and acknowledging that she had testified before the grand jury and that she knew Richard Ross, she was asked:

"And, if you know, where he [Ross] was living at that time [prior to the day of the killing] ?"

The witness declined to answer on the ground that the answer "may tend to incriminate or degrade" her.[1]

---

1. Each time the witness invoked the privilege, she used this same quoted phrase, probably on the advice of her counsel. It is settled that degradation or insult is not a proper basis for the use of the privilege. *See* Smith v. United States, 337 U.S. 137, 69 S.Ct. 1000,

The Justice excused the jury, interrogated the witness, discussed with counsel the applicable legal principles and then ruled that the witness could properly decline to answer the question. The jury was then returned and Mrs. Champagne refused to answer eleven more questions. The Justice ordered her to answer one of them[2] and he upheld her refusal as to these ten:

"Q Directing your attention back to the week of March 19, 1972, that Sunday, did you have occasion to see Richard Ross at that time?

. . . . . .

Q Did you have a discussion with Richard Ross at that time?

. . . . . .

Q Did you have occasion to see and talk with Richard Ross on Monday, March 20th, Tuesday, March 21st, and Wednesday, March 23rd, of 1972?

. . . . . .

Q When you first saw him [Ross] on that week, what was his condition?

. . . . . .

Q Did you see him [Ross] on the Tuesday of that week?

. . . . . .

Q Did you see him [Ross] on the following Saturday?

. . . . . .

Q Did you have any telephone communications from Mr. Ross during that week?

. . . . . .

Q During this week, and more specifically, Sunday the 19th of March,
and Monday, the 20th of March, of this year, did Richard Ross show you any objects?

. . . . . .

Q Did he [Ross] mention any physical objects—I can't give you an illustration—did he mention any physical objects that he had recently come into contact with, that had handled them or had used them?

. . . . . .

Q Did you give a statement to the police sometime later that week, either Thursday or Friday?

. . . . . . ."

*The Court's duty in assessing a witness' claim of the privilege against self-incrimination*

■ The Defendant's main argument is that the Justice erroneously applied a subjective standard devoid of any objective component in judging the witness' claim of constitutional privilege. Since the self-incrimination clause of the Fifth Amendment to the United States Constitution has been applied to the states in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), we may not dilute the standards which the United States Supreme Court has imposed for the assessment of a witness' claim of the privilege.[3] The proper standard, reiterated in *Malloy,* was promulgated in Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951):

"To sustain the privilege, it need only be evident from the implications of the

93 L.Ed. 1264 (1949); Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896). *Contra* Ullmann v. United States, *infra,* (Douglas, J. dissenting). We view the Justice's rulings as to Mrs. Champagne's answers as based on her expressed fear of self-incrimination and not on the unprotected sense of degradation.

2. Upon being ordered to answer a question whether she had testified before the grand jury regarding this matter, she answered that she had.

Another question was asked concerning whether Mrs. Champagne had been under oath at the grand jury. Before she could answer or invoke the privilege, the Justice required her to respond and she did so.

3. We noted in State v. Castonguay, Me., 240 A.2d 747, 753 (1968) that the federal and Maine constitutional privileges against self-incrimination are equivalent, though worded somewhat differently. A pre-*Malloy* case, Gendron v. Burnham, supra, had indicated that these two provisions were extremely similar in content.

question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because the injurious disclosure could result. The trial judge in appraising the claim, 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'" 341 U.S. at 486–487, 71 S.Ct. at 818, 95 L.Ed., at 1124.

*Accord,* Hinds v. John Hancock Mutual Fire Ins. Co., 155 Me. 349, 155 A.2d 721 (1959). The claimant of the privilege must have reasonable cause to believe that there is a real and not fancied or imaginary danger of prosecution for a crime. Mason v. United States, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198 (1917); Collett v. Bither, Me., 262 A.2d 353 (1970). Also, it must be "perfectly clear" that the witness is incorrect in gauging the danger of incrimination when all the circumstances are considered. Hoffman v. United States, supra. We have stated that the privilege must be asserted in good faith. No presumption of good faith by the witness exists. Hinds v. John Hancock Mutual Fire Ins. Co., supra.

■ The United States Supreme Court and this Court have long held that it is the Judge's responsibility to decide, under the standard recited above, whether the witness may invoke the privilege and decline to answer on the grounds of possible self-incrimination. *E. g.,* Mason v. United States, supra; Hoffman v. United States, supra; Gendron v. Burnham, supra. The Judge should evaluate the witness' assertion of privilege on a question-by-question basis. Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1950); Hinds v. John Hancock Mutual Fire Ins. Co., supra. If there is a prior indication that a witness may seek to invoke the privilege, the witness should be interrogated outside the hearing of the jury by counsel, and by the Court if necessary. After a witness asserts the privilege, no

further questioning should occur until the witness has an attorney present in court during the questioning procedure if he wishes. The Justice should rule on the claim of privilege and recall the jury if the witness is to be compelled to answer any questions. It is desirable that a witness' invocation of the privilege before the jury is to be avoided, though it is not per se prejudicial. Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963); State v. Warren, Me., 312 A.2d 535 (1973); State v. Goldman, Me., 281 A.2d 8 (1971).

■ Once the defense witness, Edith Champagne, refused to answer a question, the Justice ordered the jury to leave the courtroom and proceeded to question Mrs. Champagne concerning her good faith and actual belief that answering could incriminate her. The witness told the Justice that she had been subpoenaed, that she had an attorney present, and that she had discussed the problem with her attorney. She said that she knew that the privilege was not to be used to protect anyone besides herself, and that she must in good conscience believe that she could be incriminated by answering. These inquiries made by the Justice were necessary and appropriate in determining the witness' subjective belief that she might be incriminated. It then became the duty of the Justice to make his own determination of whether it is clear that the witness is mistaken or insincere in her claim and that the answers cannot possibly have a tendency to incriminate.

*Did the Justice use the correct standard to measure Mrs. Champagne's danger of incrimination?*

■ It is for the Justice, not the witness, to decide if the witness has reasonable cause under all the circumstances to fear the danger of self-incrimination. Though the witness' good faith and actual belief of incrimination are essential, the Court cannot defer to the witness' judg-

ment. While we note that the privilege is to be liberally applied (Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L. Ed. 511 (1956)),the Court must assure that the administration of justice is not thwarted by insincere claims of danger or by whimsical, improbable, or otherwise unlikely fears of self-incrimination, no matter how genuine these fears may be in the mind of the claimant. The Justice is not required to operate in a vacuum. He examines the inherent potential for incrimination of each question against the circumstances which surround the witness.

While the Justice did indicate in his earlier dicussion in chambers that he felt he was required to accept the witness' evaluation of the possible danger of incrimination entailed in her answers to defense counsel's questions, he later ruled in language taken from *Hoffman*. He said:

> "[C]laim of privilege should be sustained unless it is perfectly clear from the consideration of all the circumstances in the case that the witness be mistaken and that the answers can not possibly have a tendency to incriminate. I cannot say that this witness is, in fact, mistaken, and the answers could not possibly have the tendency to incrimination."

■ We are satisfied that the Justice was applying a correct standard when he ruled on Mrs. Champagne's claims of privilege. We must now consider whether he *applied* the standard *correctly* to the specific questions upon which he ruled.

*Were the Justice's rulings in declining to order the witness to answer reversible error?*

The Justice was required to consider the witness' claims of privilege in the light of the circumstances under which they were advanced. These circumstances were:

Upon reading a newspaper account of the discovery of the body of the murdered man, the witness had gone immediately to the police and had given them a statement as to Ross' account of his participation in the crime. She had appeared before the grand jury and testified under oath concerning Ross' admissions to her. Neither the statement nor the testimony disclosed any acts by her which would have constituted criminal conduct. The Justice was also told by defense counsel in the jury's absence that prior to Mrs. Champagne's Superior Court appearance she had said to the Defendant's counsel in the county attorney's office in the presence of the assistant attorney general:

> ·"I am not going to testify to hurt my friend—or lover—because you are trying to pin all the blame on him."

The assistant attorney general answered this by saying only, "I do not recall that it was worded in the manner indicated by Mr. MacNichol." [4] This tacit acknowledgment by the State that Mrs. Champagne had admitted a desire to avoid testifying in order to protect Ross must be viewed as seriously undermining the credibility of her assertion that her claim of the privilege was sincere.

The task of determining whether or not the answer to a particular qustion would carry a real danger of incrimination is certainly one of the most difficult duties given to a trial Justice. No exact formula exists for such determinations and case-by-case, question-by-question judgments can be expected.

■ It is not necessary that the particular question asked be likely to result in an admission of criminal conduct. As we said in Collett v. Bither, supra, 262 A.2d at 358, the witness must be protected against in-

---

4. Defense counsel then moved to be permitted to take the testimony of the assistant attorney general concerning Mrs. Champagne's statement. The Justice denied his motion, ruling that even if Mrs. Champagne had made this statement it "would not bar her from at this time electing to evoke the Fifth Amendment for her own rights". While Mrs. Champagne's statement would not per se bar her election of the privilege, it would certainly be relevant evidence appropriate for the Justice's consideration as to her sincerity.

voluntary disclosures of facts which might constitute an essential link in a chain of evidence by which guilt can be established.

■ Yet, in theory, at least, some of the most innocuous appearing questions *could* lead to implication in criminal conduct. The disclosure of a witness' true name or his place of residence *could* in a particular theoretical situation be the very information for which the police are waiting. Certainly, the line beyond which the interrogation may not go must not be drawn until the danger has more than such a theoretical basis. As we said in *Hinds,* supra, 155 Me. at 372, 155 A.2d at 734, the great constitutional safeguard against self-incrimination was never intended to be used as a means of avoiding disclosure of the truth by witnesses who only pretend a fear of proving themselves guilty of a crime. No one can say whether in this—or any other case—continued interrogation of a witness *may* progress into an area where real danger threatens. But until real danger is apparent, the court must remain sensitive to the reciprocal hazard that the right of a Defendant to obtain relevant testimony may be frustrated by a fancied or fraudulent claim of privilege. We think the Justice closed the door too quickly here.

We have re-examined the interrogation of the witness in the light of the circumstances disclosed by the record. We have in mind that the Justice has been given a judicial discretion to decide which questions must be answered and which are of such a nature that the witness should be excused from answering.

5. 17 M.R.S.A. § 2151.

6. 17 M.R.S.A. §§ 901, 902.

7. 17 M.R.S.A. § 3551.

8. Mrs. Champagne's grand jury testimony suggests that Ross stayed at her apartment for several days, at least. (Ross testified that he was "living at the time with Edith Champagne".) 17 M.R.S.A. § 2151 makes it a felony for a man and woman, one or both being

The witness' counsel suggested to the Court that the questions could lead to prosecution of the witness for lewd and lascivious cohabitation [5] or concealment of a felony [6] or receiving stolen goods.[7]

■ It appears obvious that the Justice did not abuse his discretion in excusing the witness from answering the first question.[8]

We feel, however, that the Justice should, *under the circumstances then existing,* have required the witness to answer the remaining questions and that his failure to do so must be considered an abuse of discretion.

■ The witness *did* report the felony to the police and the information she gave them apparently led to Ross' arrest. It seems clear to us that if Mrs. Champagne did or did not see or talk with Ross on the various occasions referred to in the questions, whatever his condition was, and whether she did or did not give a statement to the police, her answers could not tend to incriminate her. The question whether Ross had told her that he had "handled" or "used" any "physical objects" is, *under the circumstances present here,* so remote from being an implication of the witness in receiving stolen goods or any other crime that the witness should have been required to answer. We believe that it is clear that *at this point* in the interrogation the *pending* questions presented no danger of incrimination. Although we feel that the effects of the error upon the Defendant are sufficiently prejudicial to require a new trial, an additional issue remains to be discussed.

married to another person to "lewdly and lasciviously cohabit". *One* of the elements of this offense is that the parties "dwell or live together". State v. Tuttle, 129 Me. 125, 150 A. 490 (1930).

In August Ross described himself as 22 years old and as "hav[ing] been married". Mrs. Champagne, in August, was "divorced". The record does not disclose their marital status during the previous March when they were living together.

*The Defendant's request that Mrs. Champagne's grand jury testimony be presented to the jury*

Frustrated in his attempt to obtain testimony direct from Mrs. Champagne, the Defendant's attorney asked that he be permitted to present to the jury the testimony given by Mrs. Champagne before the grand jury.[9]

On retrial, Mrs. Champagne may justifiably refuse to answer *other* questions the answers to which—while relevant to impeach Mr. Ross' testimony—*would* tend to incriminate Mrs. Champagne. Her answers to some of *these* questions may also reveal potential danger as to others.

In the event that new circumstances developing at retrial again deny the Defendant the benefit of the testimony he seeks from Mrs. Champagne, we consider it likely that justice may demand that the Defendant be entitled to make known to the jury Mrs. Champagne's grand jury testimony. We think that in fairness he should have been permitted to make use of it to attack Ross' credibility in *this* trial and we find no overriding principle of law which should prevent its use.[10]

If Mrs. Champagne had answered Defendant's counsel's questions and if her answers had disclosed Ross' admissions to her in substantially the same manner as she described them in her grand jury testimony, the trial jury might well have found serious conflicts between the admissions and Ross' trial testimony. Evidence of prior, material, inconsistent statements is admissible as bearing upon the credibility of the witness' in-court testimony. State v. Pullen, Me., 266 A.2d 222 (1970); 3A J. Wigmore, Evidence § 1017 (1970).

We have also recognized that transcribed testimony given at a former hearing between the same parties, when the same issues were involved and full opportunity for cross-examination had been afforded, may be admitted at a later hearing in lieu of the testimony of a witness who has become unavailable due to death or permanent or indefinite absence from the court's jurisdiction. In State v. Budge, 127 Me. 234, 240, 142 A. 857, 860–861 (1928) the defendant was being retried after a conviction of manslaughter had been set aside. The state presented evidence that a key state witness had left the state and could not be found although a careful search for him had been made. The Court was satisfied that the witness would be unavailable for an indefinite period of time and permitted the transcript of the witness' testimony at the previous trial to be read to the jury.

The present situation, although not identical, is analogous. For reasons just discussed, Mrs. Champagne became unavailable as a witness in behalf of the Defendant —as unavailable as though she had been out of the jurisdiction or dead.

9. We are aware of the emerging and intriguing controversy surrounding the right of a defendant to present the testimony of witnesses in his behalf when other factors, such as the invocation of a witness privilege, seemingly prevent the use of such testimony. This area of discussion involves complex considerations of the concepts of fair trial, witness immunity, and separation of powers, among others. For fuller treatment of various aspects of this question, see the following sources: Brady v. Maryland, 373 U.S. 83, 83, S.Ct. 1194, 10 L.Ed. 2d 215 (1963); United States v. Berrigan, 482 F.2d 171 (3d Cir. 1973); United States v. Jenkins, 470 F.2d 1061 (9th Cir. 1972), cert. denied, 411 U.S. 920, 93 S.Ct. 1544, 36 L.Ed. 2d 313 (1973); Earl v. United States, 124 U.S.App.D.C. 77, 361 F.2d 531, reh. denied, 124 U.S.App.D.C. 77, 364 F.2d 666 (1966) (en banc) (see statement of Leventhal, J.); Note, Right of the Criminal Defendant to the Compelled Testimony of Witnesses, 67 Colum. L.Rev. 953 (1967).

10. While the defense was allowed to recall Ross for further cross-examination as to his conversation with Mrs. Champagne, this did not prove as useful as Mrs. Champagne's testimony concerning his inconsistent statements presumably would have been. Ross simply denied having made the damaging statements and refused to abandon his story that Robbins was the murderer.

The first trial in *Budge* was, of course, an adversary proceeding. Although the grand jury proceeding which resulted in the Defendant's indictment was not an adversary proceeding, this distinction is not significant as to the present question. The State—the opposite party here—had called Mrs. Champagne as a witness before the grand jury and had enjoyed the full opportunity of questioning her there.

 The basic need for secrecy of grand jury proceedings is well understood. Levine v. United States, 362 U.S. 610, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960); State v. Bowman, 90 Me. 363, 38 A. 331 (1897). In this case, the grand jury had completed its duties, the indicted parties had been taken into custody, one had testified for the State and the State's evidence against the other had been presented. Much of the need for secrecy had already been satisfied. The policy demands for secrecy to protect the usefulness and integrity of the grand jury proceedings may on occasion be subordinated to the higher demands of justice. Our Court has approved in proper cases of the presentation of a witness' earlier grand jury testimony to impeach testimony the witness gave at trial, the Court thus explaining in the colorful manner of speech of the past century:

> "Is innocence to suffer the penalty of guilt when the testimony necessary for its proof is so readily available?" State v. Benner, 64 Me. 267, 283 (1874).

and

> "The fact that a witness testified before the grand jury, and the testimony given by him, when otherwise competent, may be proved 'where the evidence is required for the purposes of public justice, or the establishment of private rights.' " Hunter v. Randall, 69 Me. 183, 189 (1879).

*See also* United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L. Ed. 1129 (1940).

M.R.Crim.P., Rule 6(d) permits a court reporter to be present in the grand jury room and to take the testimony of witnesses when ordered by the Court for good cause shown. M.R.Crim.P., Rule 6(e) condones certain disclosures of matters before the grand jury, including the disclosure by the court reporter, "when so directed by the court . . . in connection with a judicial proceeding".

In this case the grand jury testimony of Mrs. Champagne had been transcribed. We believe that, under the circumstances then existing, the ends of justice demanded that the trial jury hear Mrs. Champagne's grand jury testimony if, in fact, no opportunity to interrogate her at trial concerning this conversation was to be available to the Defendant. It is clear that this evidence could have been of real importance to the defense. Mrs. Champagne could not have been incriminated by the reading of the transcript of her grand jury testimony. She had already made available to the State whatever information it contained and the State's right to use it against her —assuming the State had such a right and that it was capable of being so used— would be unaffected by its being read to the jury.

We see no prejudice to the State if the testimony is read. If the State chose to cross-examine Mrs. Champagne concerning the incident, and if Mrs. Champagne again claimed the privilege, the State is empowered by statute to offer the witness immunity, in which case the Court would compel the witness to answer (unless the Court finds that to do so would be "clearly contrary to the public interest"). 15 M.R.S.A. § 1314–A.

The entry must be:

Appeal sustained. New trial ordered.

All Justices concurring.