STATE of Maine

v.

Michael GRANT.

Supreme Judicial Court of Maine.

Argued June 19, 1980.

Decided Aug. 6, 1980.

Henry N. Berry, III, Dist. Atty., Peter G. Ballou, Deputy Dist. Atty., Portland, Richard Currier (orally), Michael McCarthy, Law Student Interns, for plaintiff.

Farrell & Brunette, Ricky Brunette (orally), Portland, for defendant.

Before McKUSICK, C. J., and WERNICK, GODFREY, GLASSMAN and ROBERTS, JJ.

GODFREY, Justice.

Jointly indicted with Robert Barden for robbery while armed with a firearm, 17-A M.R.S.A. §§ 651, 1252(4) and (5), defendant Michael Grant was tried separately because he waived his right to a jury trial. Grant was found guilty by the trial justice, and judgment of conviction was entered. On appeal Grant raises two issues. He contends that the trial justice erred by permitting Barden, who had been tried and convicted three months before Grant and whose appeal was at that time pending before this Court, to claim a fifth amendment privilege and refuse to testify at Grant's trial. He also asserts that there was insufficient evidence to support the finding of guilt. We deny the appeal.

Evidence adduced at trial revealed that Grant was an alcoholic. His alcoholism resulted in his hospitalization for "acute brain syndrome secondary to drug and alcohol ingestion." He claimed that he suffered from blackouts and loss of memory as a result of his drinking. In October, 1978, he attempted suicide by shooting himself in the right shoulder. The bullet remained in his shoulder, and the resulting pain necessitated Grant's taking medication.

At 11:00 p. m. on December 14, 1978, the defendant left work and went to a tavern. He had one or two beers and took one of his pain-reliever pills (percadine). He then proceeded to the Plaza Lounge, where he met an acquaintance, Robert Barden. Barden was wearing a gun and holster. While at the Plaza, Grant drank some more beer and several rum-and-cokes. After the lounge closed, the defendant left with Barden in Barden's car. They visited a friend and finally arrived at the Club Night Life, an all-night club. Grant testified that he drank at least three six-packs of beer at the club. While there, they were approached by Carleton Foster.

Carleton Foster testified that he had come to Portland on December 14 to attend a Christmas party. After leaving the party, he returned to the lounge at his hotel and shared a few drinks with a young lady until closing time at 1:00 a. m. on the 15th. He then took a cab to the Club Night Life. At the club, Foster went from table to table, ending with the defendant and Barden at their table. They continued to drink beer until the three decided to leave the club. According to Foster, they decided to leave to find a better place; Grant said they left to find some women. They left in Barden's car with Barden driving.

Foster testified that he then fell asleep; that when he was awakened by the dome light of the car coming on, he found Grant pointing a gun directly at him; that Grant told him not to move an inch or he would shoot, and that Barden reached back to Foster and took his valuables. Foster was let out of the car and picked up soon afterward by the Falmouth police. The defend-ant and Barden were stopped by a Portland police officer a few minutes later for a motor vehicle violation. They were arrested after being identified by Foster.

The defendant remembered leaving the club and driving around for a short time in Barden's car. He claimed that he then blacked out because the next thing he remembered was being stopped by the Portland police.

Defendant called Barden as a witness. When asked by defense counsel why he was then in state prison, Barden invoked his fifth amendment privilege. The trial justice permitted Barden to invoke the privilege on the ground that his conviction did not constitute a final determination until disposition of his appeal. Defendant's ensuing motion for a mistrial was denied.

The defendant argues that there are two grounds on which the trial justice should have denied Barden's privilege and compelled his testimony: first, that Barden had already been convicted of the crime in question, so that he was subjected to no real danger of further incrimination; second, that Barden had waived his privilege by testifying at his own trial.

We conclude that there was no way in which defendant could have been prejudiced by the exclusion of Barden's testimony in this trial and therefore find it unnecessary to address the constitutional issues that would otherwise have required determination. Cf. *State v. Robbins*, Me., 318 A.2d 51 (1974).

In view of the prior testimony of Barden at his own trial, he could not have been a beneficial witness for defendant Grant. At his own trial, Barden had denied participating in a robbery. Instead, he had testified that while they were riding around, Grant and Foster engaged in a heated argument; that Grant suddenly grabbed Barden's gun and pointed it at Foster, causing Barden to stop the car; that Grant then pulled Foster out of the car; that Barden got out of the car when he became concerned that Grant might shoot Foster, and that he persuaded

Grant to get back into the car, leaving Foster standing by the side of the road.[1]

■ Rule 103(a)(2) of the Maine Rules of Evidence provides that error may not be predicated on a ruling excluding evidence unless a substantial right of the party is affected and the substance of the evidence is made known to the court by offer of proof or is apparent from the context within which questions are asked. An offer of proof enables the appellate court to appraise the scope and effect of the ruling so that it can determine whether the ruling was reversibly erroneous as affecting a substantial right of the party seeking to have the evidence admitted. R. Field and P. Murray, *Maine Evidence* § 103.4 (1976). Defense counsel made the following offer of proof as to the reason defendant was seeking Barden's testimony:

> In reviewing Mr. Barden's testimony from his own trial, that testimony conflicts with testimony given by Mr. Foster and will also conflict in some respects with testimony given by Mr. Grant. It is our belief quite frankly that Mr. Barden was not being fully truthful. Therefore, we would hope to have an opportunity in terms of examining Mr. Barden, having the transcript from the prior trial to point out inconsistencies and any changes of testimony in order to show that Mr. Barden was in fact not being truthful and that his role in these events was something other than what he had testified to at his own trial.

In reply to a question by the trial justice, defense counsel said that Barden's testimony would diminish the state's cause as presented, "insofar as he [Barden] claims there was no robbery at all."

The purposes thus offered by defense counsel for seeking Barden's testimony were essentially self-contradictory. Insofar as Barden's testimony would have tended to show that no robbery took place, Grant would lose rather than gain by impeaching him.[2] The state's case against Grant depended on the testimony of the victim, Foster, and three police officers. Impeachment of Barden by examining Barden and pointing out discrepancies, if any, between his earlier and later testimony would have had no tendency to impeach Foster or other state's witnesses and could not tend to weaken the case that the state had presented against Grant. If Grant wanted to show inconsistencies between Barden's and Foster's testimony at Barden's trial or inconsistencies in Foster's testimony in the two trials, the transcript of the Barden trial was available to Grant as evidence for those purposes.

Defense counsel also suggested that Barden's testimony would show that Barden was a "leader" and was in control during the robbery, an inference that the factfinder could draw from hearing Barden testify. Grant would appear as a passive follower. The factfinder would then infer "that Mr. Grant was little more than a stage prop in this thing if in fact Mr. Foster is to be believed as to the circumstances of the robbery."

The defendant would not have been aided by showing Barden to be a leader and Grant "little more than a stage prop." The defendant never attempted to raise a defense of duress or involuntary conduct. Even if the defendant acted because he was following Barden's leadership, that fact alone would not exonerate him from responsibility for the robbery.

1. The state's motion to supplement the record on appeal by including the reporter's transcript in *State v. Robert J. Barden* was granted *de bene esse*, subject to being acted on finally by the Court after oral argument. At oral argument, counsel for the defendant said he had no objection to the state's motion. Therefore we have ordered that the record in this case be supplemented to include the reporter's transcript in *State v. Robert J. Barden*, Docket No. Cum–79–58.

2. Barden had not testified that there was no robbery at all; he had testified merely that he did not commit one. The plain implication of Barden's testimony in his own trial had been that Grant could have robbed Foster during the time that Grant had dragged Foster out of the car but before Barden had intervened.

The offer of proof does not show that the exclusion of the testimony affected substantial rights of the defendant. Rule 103(a) M.R.Evid. Thus, if any error occurred in not compelling Barden to testify, the error was not prejudicial and must be disregarded. Rule 52(a) M.R.Crim.P.

## II.

█ The defendant contends that the evidence adduced at trial was insufficient to prove that he had the capability to form the necessary intent to commit robbery because he was too intoxicated at the time of the alleged offense to have the necessary intent to commit robbery. See 17–A M.R.S.A. § 58–A· (Supp.1979). He moved for a new trial after the trial judge's decision, thereby preserving, on appeal, the issue of sufficiency of the evidence. See Rules 29(b) and 33, M.R.Crim.P.

The elements of the crime charged, which the State had to prove beyond a reasonable doubt, were that the defendant obtained unauthorized control over the property of Foster with the conscious object to deprive him of that property, and that the defendant threatened to use force against Foster with the conscious object to compel him to give up that property.[3] The defense of intoxication is provided in § 58–A, subsection 1 of which provides:

1. Intoxication is not a defense unless it establishes a reasonable doubt as to the existence of an element of the offense.

Evidence was presented to show that the defendant had consumed alcoholic beverages on the night of the robbery. The defendant testified that he drank more than three six-packs of beer and some run-and-cokes. In addition, he took some of his pain medication. He claimed to have suffered before from black-outs due to alcoholism, and to have again blacked out on the night in question. He presented expert medical testimony that, given his medical history and alcohol intake that night, it was "more probable than not that his ability to function intentionally . . . would be impaired." A second medical expert concluded "the defendant was incapable to form his rational intent to deprive the victim of his valuables or to compel the victim to give up his property."

At the end of the trial, the trial judge found defendant guilty, concluding that the defendant had participated in the armed robbery of Foster and that he had the requisite intent to commit robbery.

As the trial justice pointed out, Foster's testimony concerning the actual robbery was not disputed by the defendant. He merely claimed that he blacked out during that time. Foster said that while Grant was in the car his speech was clear and not slurred and that he appeared to have "really meant business" when he told Foster not to move an inch or he would shoot. A Portland police officer testified that a handgun later identified by Foster as the weapon used by Grant was found under the defendant's seat, partially hidden by a paper bag. That evidence could have been regarded by the factfinder as evidence of a conscious attempt by the defendant to hide the weapon.

The evidence was sufficient to support the judgment.

---

**3.** Section 651 of the Criminal Code provides in part:

1. A person is guilty of robbery if he commits or attempts to commit theft and at the time of his actions:

. . . .

B. He threatens to use force against any person present with the intent

. . . . .

(2) to compel the person in control of the property to give it up or to engage in other conduct which aids in the taking or carrying away of the property;

. . . . .

Section 353 of the Criminal Code provides:

1. A person is guilty of theft if he obtains or exercises unauthorized control over the property of another with intent to deprive him thereof.

. . . . .

"Intentionally" as a culpable state of mind, is defined in § 10(1)(A) of the Criminal Code:

A. A person acts intentionally with respect to a result of his conduct when it is his conscious object to cause such a result.

The entry is:

Appeal denied.

Judgment affirmed.

All concurring.