STATE of Maine

v.

Gerald TROIANO.

Supreme Judicial Court of Maine.

Argued June 3, 1980.

Decided Oct. 15, 1980.

Michael D. Seitzinger, Asst. Atty. Gen. (orally), Augusta, John Atwood, Dist. Atty., Rockland, for plaintiff.

Berman, Berman & Simmons, P.A., William D. Robitzek (orally), Jack H. Simmons, Lewiston, for defendant.

Before McKUSICK, C. J., and WERNICK, NICHOLS and GLASSMAN, JJ.

GLASSMAN, Justice.

On August 23, 1979, codefendants Gerald Troiano and Albert Paul were found guilty by a jury in the Superior Court, Knox County, of aggravated arson, 17–A M.R. S.A. § 801 (repealed, P.L. 1979, ch. 322, § 1, effective September 14, 1979). From the judgment of conviction Troiano timely appeals, contending that the presiding Justice erred in denying his motion to require the State to extend immunity to a prospective defense witness, in instructing the jury concerning reasonable doubt and in refusing to give requested instructions concerning immunized witnesses. Additionally, Troiano asserts that the crime of aggravated arson requires conscious disregard of a substantial risk to a particular person, which element the State neither alleged nor proved, and contends, therefore, that the presiding Justice erred in denying his motion for judgment of acquittal. We affirm the judgment.

On January 13, 1979, one Lauren Ruybal was transferred from a minimum security unit to the Maine State Prison and assigned to cell number P–2 in the prison's east wing. Approximately one week later, at least one other inmate observed Ruybal entering the office of Detective Hathaway of the Maine State Police. On the morning of February 1, 1979, after Ruybal had left his cell for breakfast, a fire determined later to have been of incendiary origin destroyed cell number P–2 and caused damage to the corridor and two adjacent cells. Troiano was indicted for aggravated arson and tried jointly with defendant Paul.

The jury was entitled to find that Paul believed Ruybal was working for Detective Hathaway and offered Troiano $30.00 to have Ruybal "burned out." Paul thought that as a likely consequence of the proposed fire Ruybal would be moved to a cell near Paul's where Paul "could take care of it from there." Troiano and Paul solicited inmates Timothy Bucklin and Lawrence Seekins to carry out the plan. The following morning at approximately 8:00 a. m., while Bucklin stood watch at the end of the corridor, Seekins started the fire with some turpentine taken from the woodshop. Later that day Seekins "paid" Bucklin approximately $50.00 in prison "tickets" redeemable for goods at the prison commissary.

## I

Bucklin appeared as a witness for the prosecution after having been granted immunity pursuant to 15 M.R.S.A. § 1314–A. Troiano's attorney then moved orally that Lawrence Seekins likewise be compelled to testify and be granted immunity. The presiding Justice denied the motion, concluding that under the circumstances he lacked the power to grant the immunity requested. Seekins was never called as a witness, but defense counsel made an offer of proof as follows:

That and with my motion for asking for immunity and my request for interpretation of the privilege question, I would like to make a formal offer of proof that if Mr. Seekins were allowed to testify either after the grant of immunity or of the Court's interpretation that his privilege against self–incrimination can be claimed on the day of the fire and not prior thereto, Mr. Seekins would testify that on the day before the fire he was assigned to kitchen duties; that he at no time met with or had any conversations with, whatsoever, either Mr. Paul or Mr. Troiano; that he never on that day or any other day talked to or agreed with Troiano or Paul or either of them or both of them to set any premises on fire for any reason whatsoever. Mr. Seekins would also testify that every word spoken by Mr. Bucklin with regards to this agreement was false and erroneous.

Mr. Seekins would also testify that he was friendly with Mr. Bucklin, and that Mr. Bucklin was heavily in debt within the prison circumstances, that he owed a large number of debts to a large number of people and that Bucklin was apprehensive about being in debt because he had no ready way of paying that back, paying the money back and that to owe money in the prison situation is a dangerous situation.

Mr. Seekins would also testify that on the day of the fire, if allowed to, that on the day of the fire he never saw, met with or talked to Bucklin at any time prior to the fire; that he did not set the fire; that he did not go on the P–Corridor whatsoever and that his testimony would be, as he indicated [in] his statement given to Detective or Corporal Hathaway that on February 1st, 1979, he, Seekins, took his sheets and pillow cases [sic] from his cell, which is F–14; walked down the F–Corridor and gave up his sheets and had them checked off; that he thinks it was to Guard Farrington; that he remained in the area, somebody yelled fire and that he then went to the East Wing office which I believe is located on the Second Tier, and that he observed the fire and the flames and smoke and people rushing around up on the Fourth Tier for approximately fifteen minutes. And that subsequently he left the Second Tier, immediately left the building and went on his way.

Troiano asserts that the presiding Justice's denial of his motion seeking immunity for prospective defense witness Seekins violated his right to have compulsory process for obtaining witnesses in his favor, U.S. Const. amend. VI; Me.Const. art. I, § 6, his right to be confronted with the witnesses against him, *id.*, and his right to due process, U.S.Const. amend. XIV; Me.Const. art. I, § 6–A. Troiano argues that under the particular circumstances here presented, where the State had granted immunity to Seekins' alleged coconspirator and where Seekins' testimony would directly contradict that of the State's witness, due process requires that immunity be granted. The defendant suggests that the refusal to confer reciprocal immunity effectively deprived him of crucial evidence because, as the defense attorney explained to the court, Seekins would claim his full fifth amendment privilege and refuse to testify.

█ It is not necessary for us to reach the merits of the defendant's constitutional claims because we conclude that he failed to generate those issues at trial. Seekins was never called to testify and, therefore, it is purely speculative whether he would have refused to testify without a prior grant of immunity. Having failed to establish any need for immunity, the defendant cannot now claim that the presiding Justice's refusal to grant, or to compel the State to grant, reciprocal immunity deprived him of any testimony, much less of a fair trial. *United States v. Wright,* 588 F.2d 31, 36–37 (2d Cir. 1978), *cert. denied,* 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979); *United States v. Carman,* 577 F.2d 556, 561 (9th Cir. 1978); *cf. United States v. Klauber,* 611 F.2d 512 (4th Cir. 1979).

The Maine immunity statute, 15 M.R.S.A. § 1314–A, provides:

In any criminal proceeding before a court or grand jury, if a person refuses to answer questions or produce evidence of any kind on the ground that he may be incriminated thereby, and if the prosecuting attorney, in writing, and with the written approval of the Attorney General, requests the court to order that person to answer the questions or produce the evidence, and the court after notice to the witness and hearing shall so order, unless it finds to do so would be clearly contrary to the public interest, that person shall comply with the order. After complying, and if, but for this section, he would have had the right to withhold the answers given or the evidence produced by him, that person shall not be prosecuted or subjected to penalty or forfeiture for or on account of any transaction, matter or thing concerning which, in accordance with the order, he gave answer or produced evidence. Failure to answer questions or produce evidence as ordered by the court following notice and hearing shall constitute contempt of court. He may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing or contempt committed in answering, or failing to answer, or in producing or failing to produce evidence, in accordance with the order.

█ As the statute makes clear, it is an essential prerequisite to a grant of immunity that the person refuse to answer questions or produce evidence on the ground of self–incrimination. It is solely the responsibility of the presiding Justice to decide whether the witness may invoke the privilege against self–incrimination and decline to answer. *State v. Robbins,* Me., 318 A.2d 51, 57 (1974). Only then does the issue arise whether immunity should be granted.[1]

---

1. We note that the purported grant of immunity to Bucklin was apparently not in compliance with 15 M.R.S.A. § 1314–A. The record does not reveal that Bucklin had refused to testify on the ground of self–incrimination. No notice or hearing was granted to Bucklin. The court did not issue an order directing Bucklin to testify. An attempt to grant immunity without formal compliance with the statute is ineffective. *State v. Brown,* Me., 321 A.2d 478, 484 (1974). The defendant gains nothing by our suggestion that the grant of immunity to Bucklin was ineffective since none of the defendant's personal rights were violated. *See State v. Melvin,* Me., 390 A.2d 1024, 1029 (1978).

Furthermore, on the basis of the offer of proof made by defense counsel, it does not appear that Seekins would have been entitled to claim a privilege under the State or Federal Constitution.

[T]he constitutional privilege against self–incrimination protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used. *State v. Vickers*, Me., 309 A.2d 324, 327 (1973).

That danger must be "real and not fancied or imaginary." *State v. Robbins, supra*, 318 A.2d at 57; *Collett v. Bither*, Me., 262 A.2d 353, 358–59 (1970). In the case at bar, defense counsel informed the court below that Seekins would deny any participation in the planning and in the setting of the fire. Without more, Seekins, had he been called to testify, would not have been entitled to refuse to answer questions concerning the alleged arson since based on the offer of proof his answers would have had no tendency to incriminate him. On this record, the defendant cannot claim that the denial of immunity for Seekins resulted in the suppression of evidence necessary to a fair trial.

## II

As a part of his instruction on the State's burden of proof and reasonable doubt, the presiding Justice stated that reasonable doubt "is the kind of doubt that you would employ frequently in the most important of your affairs in failing to act because you were or were not satisfied beyond a reasonable doubt." At the conclusion of the charge, defense counsel objected, stating:

Objection to the Court's definition of reasonable doubt as reasonable doubt was given to the jury. The Court defined reasonable doubt as one–the Court in defining reasonable doubt talked in terms of failure to act as opposed to hesitate to act. I believe the appropriate standard is that there must be that kind of doubt which one would hesitate to act in its most important affairs as opposed to failure to act. And I would request the Court to clarify that for the jury.

The court sought to clarify its instruction by charging the jury as follows:

Now I think when I was discussing reasonable doubt I may have inadvertently used a different word, but what we are talking about is a reasonable doubt as you experience in your own daily affairs when you have hesitated to act because you were impressed beyond a reasonable doubt of what you were doing or should not do.

Defense counsel again objected, stating:

I think that the test is whether or not there is a doubt which would make them hesitate to act. If that exist [sic], then they must say not guilty if they would hesitate to act in their most important affairs.

On appeal, the defendant argues that these instructions confused and misled the jury. We have recently repeated our admonition that the preferred practice is to avoid any resort to the "affirmative action" analogy. *State v. Estes*, Me., 418 A.2d 1108, 1115 (1980). We there noted, however, that the analogy is permissible when accompanied by a description of reasonable doubt "as that quantum of proof sufficient to cause a reasonable person to hesitate to act–or to act without hesitation . . . ." *Id.*

The court's total instruction on the presumption of innocence and proof beyond a reasonable doubt ran for over two pages in the transcript. Although the language singled out by the defendant is hardly a model of clarity, we are satisfied that the instruction in its entirety adequately advised the jury of the degree of conviction as to the truth of the charge which the jury must have before it could find the defendant guilty. *See State v. Estes, supra*, 418 A.2d at 1117. We again caution the justices of the Superior Court that they should exercise extreme care when instructing juries on the State's burden of persuasion.

## III

At the conclusion of all the evidence and prior to the jury charge, the defendant submitted to the court in writing two pro-

posed jury instructions regarding the testimony of immunized witnesses. The first explained that such testimony "must be examined and weighed ... with greater care than the testimony of an ordinary witness." The second quoted language from *State v. Jewell*, Me., 285 A.2d 847 (1972), that such testimony " 'has inherent weaknesses because of its proclivity for untrustworthiness.' " *Id.* at 851. The presiding Justice declined to charge the jury in the precise terms requested by the defendant. This was not error so long as the jury was otherwise properly instructed in accordance with law. *State v. Smith*, Me., 400 A.2d 749, 756 (1979); *State v. Wallace*, Me., 333 A.2d 72, 80 (1975); *State v. Warner*, Me., 237 A.2d 150, 159 (1967). *See also State v. Porter*, Me., 404 A.2d 590 (1979); *United States v. Wright*, 573 F.2d 681 (1st Cir.), *cert. denied*, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978).

■ Upon review of the charge as given, we conclude no error was committed. The presiding Justice first instructed the jury in general terms to consider any possible interest or bias of the witnesses when evaluating their testimony. He then gave an instruction pertaining specifically to the testimony of immunized witnesses:

> Certainly you have heard the testimony in this case of those who were alleged to be accomplices, those who have been granted immunity, those who have some privilege or interest. These witnesses are competent to testify, but you should again accept their testimony with caution and evaluate it carefully in determining whether or not their interest or their involvement is sufficient or do [sic] in someway [sic] color their testimony.

The presiding Justice clearly singled out the testimony of immunized witnesses for cautious evaluation. His failure to instruct in the exact language requested was not error.

## IV

The indictment originally charged that the fire of February 1 caused serious bodily injury to prison guard Lawrence Farrington. On the first day of trial, the presiding Justice granted the State's motion to dismiss that portion of the indictment. The defendant subsequently moved for a judgment of acquittal on the basis that the indictment failed to allege risk to a *particular* person. This motion was denied, and the assertion has been renewed on appeal.

The now–repealed aggravated arson provision of the Maine Criminal Code, 17–A M.R.S.A. § 801(1), under which the defendant was charged, provided:

> A person is guilty of aggravated arson if he intentionally starts, causes or maintains a fire or explosion that damages any structure which is the property of himself or of another, in conscious disregard of a substantial risk that at the time of such conduct a person may be at or in proximity to such structure.

Prior to its repeal, aggravated arson was classified as a Class B crime unless the fire or explosion caused death or serious bodily injury, in which event the violation was classified as a Class A crime. The defendant bases his argument that intent to harm a particular person is an element of aggravated arson which the State must plead and prove on the difference in the language of Section 801(1) and Section 802 which defines the crime of simple arson.[2] More particularly, the defendant compares the use of the words "a person" in Section 801(1) to the use of the words "any person"

2. 17–A M.R.S.A. § 802 (Supp.1978) provided in pertinent part:

§ 802. Arson
1. A person is guilty of arson if he starts, causes, or maintains a fire or explosion;

. . . . .

B. On his own property or the property of another

. . . . .

(2) in conscious disregard of a substantial risk that his conduct will endanger any person or damage or destroy the property of another.

. . . . .

3. Arson is a Class B crime.
The penalty classification of arson was increased from Class B to Class A by amendment, P.L.1979, ch. 322, § 2, effective September 14, 1979.

in Section 802(1)(B)(2) and asserts that that difference indicates that the Legislature intended the crime of aggravated arson to penalize arsonists who intend to inflict bodily injury to a specific individual through the medium of burning property. This interpretation, he contends, would resolve "the apparent paradox that the harsher crime [is] only concerned with the possibility of physical presence while the lesser crime relies on a risk of actual danger."

■ We do not agree that the Legislature intended Section 801 to have so narrow an application. As the comments to Sections 801 and 802 make clear, those sections were based directly upon the arson provisions of the Massachusetts and federal proposed criminal codes, neither of which distinguished aggravated arson from simple arson on the basis here suggested by the defendant. *See* Proposed Criminal Code of Massachusetts, ch. 266, §§ 3, 4 (1972); S. 1, 93d Cong., 1st Sess. §§ 2–8B1, 2–8B2 (1973). Furthermore, the comment to Section 801 explains that the criminal conduct sought to be penalized by the various arson provisions of Sections 801–804 is damage to *property* caused by fire or explosion. These crimes "are graded as to sentencing class on the basis of the nature of the risk which is presented to life and property by the particular conduct." Comment to 17–A M.R.S.A. § 801. The concern, thus stated, is with the creation by arson of a risk of harm to human life in general rather than with the intent to cause harm by fire to a particular person. This interpretation is entirely consistent with the fact that both simple arson and aggravated arson which does not actually cause death or serious bodily injury were formerly denominated Class B crimes.

The internal structure of Section 801 provides additional reason to reject the defendant's argument that the words "a person" were intended to mean "a particular person." Subsection 2 of Section 801 provided that "it is no defense to a prosecution under this section that no person was present in the structure." Similarly, subsection 5 classified aggravated arson as a Class A crime if death or serious bodily injury is caused "to any person at or in proximity to such

structure." Had the Legislature intended Section 801 to be given the meaning urged by the defendant, internal consistency and logic would have required an appropriate substitution of the phrase "person intended to be harmed" in subsections 2 and 5.

We recognize that under this view Sections 801 and 802 as originally drafted were overlapping. That fact serves in part to explain the recent repeal by the Legislature of Section 801. We conclude that the defendant's conduct was proscribed by the aggravated arson statute.

The entry is:

Judgment affirmed.

All concurring.